494 So.2d 969 (1986)
Askari Abdullah MUHAMMAD, Appellant,
v.
STATE of Florida, Appellee.
No. 63343.
Supreme Court of Florida.
July 17, 1986.
Rehearing Denied October 22, 1986.
*970 Michael E. Allen, Public Defender, and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Calvin L. Fox, Asst. Atty. General, Miami, for appellee.
PER CURIAM.
This case is before us for review of a death sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Muhammad, awaiting execution on death row,[1] fatally stabbed a prison guard in the late afternoon of October 12, 1980. The incident apparently arose out of Muhammad's frustration at being denied permission to see a visitor after he refused to shave his beard. In the past Muhammad had been issued a pass excusing him from shaving regulations for medical reasons. A guard checked with the medical department and determined that Muhammad had no current exemption from the rule. At that time Muhammad was heard to say he would have to start "sticking people."
James Burke, a guard on a later shift who had not been involved with the shaving incident, was routinely taking death row inmates one at a time to be showered. When he unlocked Muhammad's cell, the defendant attacked Burke with a knife made from a sharpened serving spoon. Muhammad inflicted more than a dozen wounds on Burke, including a fatal wound to the heart. The weapon was bent during the attack, but Muhammad continued to stab Burke, who attempted to fend off the blows and yelled for help. The other guard on the prison wing saw the incident from a secure position and summoned help from other areas of the prison. When help arrived, Muhammad ceased his efforts and dropped the knife into a trash box.
Two lawyers were initially appointed to represent Muhammad. One, Susan Cary, had represented Muhammad in matters related to his prior murder case. The other was a public defender. The public defender withdrew after differences arose with Cary. For reasons undisclosed in the record, the original trial judge, Judge Green, ended Cary's appointment and appointed Stephen Bernstein to represent the defendant from the beginning of 1981.
The first indication in the record that Muhammad desired to proceed pro se is found in a transcript of a hearing that took place on January 12, 1981 before Judge Green. At the hearing, Bernstein moved to withdraw and, as the judge observed at the hearing, Muhammad argued "eloquently and obviously with much thought and consideration" to represent himself. Judge Green, advising Muhammad against proceeding pro se, noted Muhammad seemed competent to do so, but asked him to "sleep on it" and write the judge a letter with his final decision. Muhammad wrote the letter, electing to proceed pro se, but insisting, as he had at the hearing, that he wanted "assistance of counsel" in the sense of having a lawyer available to aid in preparation of the case. January 21, 1981, Judge Green recused himself for reasons not known by or raised before this Court, and also denied Muhammad's motion to proceed pro se. Judge Green's order stated that Muhammad did not have the capacity to conduct his own defense either because of the difficulty of preparing while on death row, or because of incompetence, or both.
Muhammad's attorneys were concerned about his mental state from the start. Shortly after the murder, they had Dr. Amin appointed as a defense advisor pursuant to the newly adopted Florida Rule of *971 Criminal Procedure 3.216(a).[2] Dr. Amin had examined Muhammad in matters relating to his prior conviction. February 25, 1981, attorney Bernstein filed a notice of intent to claim the defense of insanity. June 10, 1981, Judge Carlisle, who had been appointed to replace Judge Green, filed an order appointing Doctors Barnard and Carrera, psychiatrists, to examine Muhammad to determine his competency to stand trial and his sanity at the time of the offense. Fla.R.Crim.P. 3.210(b) and 3.216(d). Muhammad refused to meet the doctors when they tried to examine him July 4, 1981, and met them but refused to cooperate at a second attempt that November.
Based on Muhammad's refusal to speak with the court-appointed experts, Judge Carlisle ruled in a hearing March 8, 1982, that Muhammad would not be allowed to present expert testimony regarding his insanity defense but that he would be allowed to raise the defense. Two weeks prior to the trial date of May 24, 1982, Bernstein filed a written proffer of the evidence and testimony he planned to present relating to the insanity defense.
The proffer included a summary of findings by a psychiatrist and psychologist who treated the defendant during a hospitalization at Northeast Florida State Hospital in 1971, suggesting he was suffering from early stages of schizophrenia. A clinical psychologist diagnosed the defendant a paranoid schizophrenic in 1975 after an examination for a competency hearing before the trial for the prior murders. The diagnosis was echoed by another psychologist in a 1979 evaluation. Finally, Dr. Amin's findings as a defense expert were summarized, including a diagnosis of "schizophreniaform illness" but recommending further testing to rule out epilepsy.
At a hearing May 17, 1982, a week before trial, Bernstein requested a competency hearing. The judge agreed to a final effort to have the two appointed psychiatrists evaluate Muhammad. At Bernstein's urging, the judge also appointed Dr. Amin as a third expert for the court evaluation. Bernstein also told the judge that Muhammad had refused to meet with him for several months, and that Dr. Amin had not spoken with Muhammad for almost one year, although Dr. Amin had made two attempts during that period.
A letter from Drs. Barnard and Carrera states they were again rebuffed May 18, 1982, and that they were unable to determine the defendant's competency to stand trial, despite "relevant case materials" provided by defense and prosecution attorneys. Dr. Amin was more successful, meeting with the defendant and determining that he was competent to stand trial. A letter to that effect was filed May 19.
May 20, 1982, Judge Carlisle, Bernstein, the state attorney and Muhammad were present at a competency hearing at Florida State Prison. The hearing was unrecorded, although the judge had requested a reporter when the hearing was set. The reconstructed record prepared by defendant's appellate counsel is sketchy, but states that "[b]ased upon Mohammad's [sic] refusal to cooperate with Drs. Barnard and Carrera, and Dr. Amin's report, the court found Mohammad [sic] competent to stand trial. What argument defense counsel made in opposition to the court's order is unknown." Muhammad also raised anew his request to proceed pro se.
Trial was begun May 24, 1982. In a hearing before voir dire began, Judge Carlisle ruled that no evidence of any kind could be presented concerning Muhammad's sanity at the time of the crime. Muhammad again moved to proceed pro se and *972 was denied. The trial ended in mistrial the next day for reasons unknown and not raised to this Court. Two days later, Judge Carlisle filed a recusal and Judge Chance was assigned to the case. Judge Chance conducted a hearing on Muhammad's motion to proceed pro se June 7, 1982. The judge attempted to dissuade Muhammad, explaining in detail disadvantages and soliciting comment from Muhammad. The hearing ended with the ruling that Muhammad could represent himself. Bernstein was appointed as "standby" counsel, to step in should Muhammad be unable to continue with trial. Muhammad also, for the first time, complained about the competency interview with Dr. Amin. He stated that he thought Amin was meeting with him in his capacity as a defense advisor, not as a court-appointed expert. He said he probably would not have spoken with Dr. Amin had he known the true circumstances of the interview, just as he had not spoken to the other two experts. Although objecting to the determination of competency based on the Amin report, Muhammad did not move to strike the report or suggest any other relief.
Muhammad renewed his objection to the Amin interview at a July 19, 1982 motion hearing.
Prior to trial the court allowed Bernstein to withdraw as standby counsel and appointed a public defender. September 3, 1982, Muhammad filed a motion withdrawing his notice of intent to use the insanity defense. In a pretrial conference, the state withdrew its motion to strike the insanity defense and the judge granted Muhammad's motion. At trial, Muhammad's defense consisted solely of holding the state to its burden of proof by pointing out inconsistencies in the testimony of the state's witnesses. The jury found Muhammad guilty as charged. He waived his right to a jury recommendation in the penalty phase and the trial judge sentenced him to death, finding nothing in mitigation and three aggravating circumstances: the defendant was under a sentence of imprisonment, he had been convicted of a prior capital felony, and the murder was heinous, atrocious or cruel.

COMPETENCY TO STAND TRIAL
Muhammad's appellate counsel first challenges the findings by the trial court that the defendant was competent to stand trial and that he validly waived his right to counsel.
Muhammad's competency is the primary question in this case. As appellate counsel for the defendant stated at oral argument, the question is whether a person is competent if he refuses to raise an insanity defense when there is a substantial question of his sanity at the time of the offense. However, that is not the question to be answered regarding competency. The standard of competency to stand trial is this:
A person is incompetent to stand trial within the meaning of this chapter if he does not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or if he has no rational, as well as factual, understanding of the proceedings against him.
§ 916.12(1), Fla. Stat.(1981).
Muhammad attacks the determination that he was competent on the ground that it is not supported by sufficient evidence. First, he claims the trial court failed to follow the dictates of Florida Rule of Criminal Procedure 3.210. The rule requires the court to appoint "no more than three nor fewer than two experts" to examine the defendant. However, it does not require that the experts succeed in examining the defendant. Muhammad refused to cooperate on three separate occasions with Drs. Barnard and Carrera. Dr. Amin's examination found Muhammad competent. Appellant refers us to Ross v. State, 386 So.2d 1191 (Fla. 1980), wherein we held that an unequivocal finding of competency by one expert is sufficient and it is not error to refuse to appoint a second expert when the defense fails to present evidence that further examination is needed. Here, appellant argues, Dr. Amin's report was not unequivocal and the evidence in the proffer *973 suggested the need for further examination.
We find no merit in this argument. Three experts had been appointed and the defendant consistently refused to be examined by two of them. There is no duty for the court to order a futile attempt at further examination. A defendant may not thwart the process by refusing to be examined. The lack of expert testimony under these circumstances is alone not grounds for finding error. The reports of experts are "merely advisory to the Court, which itself retains the responsibility of the decision." Brown v. State, 245 So.2d 68, 70 (Fla. 1971), vacated in part on other grounds, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972).
If the court has followed the procedures of the rules and the defendant's own intransigence deprives the court of expert testimony, the court must still proceed to determine competency in the absence of such evidence. The record demonstrates that Judge Carlisle had an opportunity to observe Muhammad's behavior at the competency hearing, to review a letter and various pleadings handwritten by the defendant and a part of the file, and to review the proffer of expert evidence. The proffer indicates Muhammad suffered mental problems, but one need not be mentally healthy to be competent to stand trial. Nothing in the record available to Judge Carlisle dispositively demonstrates Muhammad was incompetent. See Williams v. State, 396 So.2d 267 (Fla. 3d DCA), review denied, 407 So.2d 1107 (Fla. 1981) (probability that defendant was "more likely than not" incompetent at time of trial insufficient grounds to order new trial). Muhammad's pleadings and behavior both before and after the determination of competency clearly indicate he had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and had a] rational, as well as factual, understanding of the proceedings against him." § 916.12(1), Fla. Stat. (1982). Even if the Amin report were excluded, there is sufficient evidence to support the determination of competency.
In light of this conclusion, Muhammad's challenge to the Amin report cannot be sustained on any ground. However, we discuss the issue because the report buttresses the other evidence supporting the finding that Muhammad was competent.
Muhammad claims he did not know the purpose of Dr. Amin's competency examination, that neither his attorney nor Dr. Amin informed him of the reason for the interview, and that he thought he was meeting with Dr. Amin in the role of defense expert pursuant to his appointment under Florida Rule of Criminal Procedure 3.216(a), and thus his communications were protected by the attorney-client privilege of the rule. See State v. Hamilton, 448 So.2d 1007 (Fla. 1984).
We find no merit in this claim. Muhammad waived the privilege when he failed to object to submission of the report at the May 20, 1982 competency hearing. The record shows Judge Carlisle's handwritten annotation on the report that it was submitted as a joint exhibit, indicating that Bernstein waived any alleged privilege as to the report, and the reconstructed record does not indicate Muhammad raised any objection to the waiver. Compare Lebowitz v. State, 313 So.2d 473 (Fla. 3d DCA 1975), cert. denied, 330 So.2d 19 (Fla.), vacated on other grounds, 429 U.S. 808, 97 S.Ct. 44, 50 L.Ed.2d 68 (1976) (defendant may impeach witness by eliciting psychiatrist's opinion as to competence of witness, but content of conversations with the witness is protected by psychiatrist-patient privilege of section 90.242, Florida Statutes (1973)).
Muhammad also attacks the Amin report for alleged failure to include matters required by Florida Rules of Criminal Procedure 3.216(e) and 3.211(a)(1). A cooperative defendant objecting to admission of reports substantially deficient under these rules may well be entitled to have those objections sustained. See Livingston v. State, 415 So.2d 872 (Fla. 2d DCA 1982) (defendant entitled to new competency hearing when experts' testimony fails to *974 show the matters outlined in rules 3.211 and 3.216 were considered). Muhammad neither cooperated nor objected. An expert's report is merely evidence for the court to utilize in determining competency. A determination of competency is not invalid because of deficiencies in a report unless the deficiencies substantially undermine the sufficiency of evidence supporting competency.

COMPETENCY TO WAIVE COUNSEL
Muhammad's appellate counsel next raises the question of whether Judge Chance properly granted Muhammad's motion to proceed pro se. Appellant urges that the judge failed to question whether Muhammad was competent to make the decision to waive counsel and to conduct his own defense. Appellant relies on Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), wherein the Court held that, despite a prior determination of competency to stand trial, an inquiry must be made into whether a defendant is competent to waive his right to counsel and conduct his own defense. See also Massey v. Moore, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135 (1954): "One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel." Id. at 108, 75 S.Ct. at 147.
Appellant concedes that Judge Chance properly determined that Muhammad knowingly and voluntarily waived his right to counsel. The argument is that the judge should also have determined whether Muhammad was competent to do so and whether he was competent to proceed pro se. This would appear to be a bifurcated question: one might be competent to make the decision to waive counsel but still not be sufficiently competent to proceed on the consequences of that waiver, i.e. conduct the defense. However, Muhammad draws our attention to a unitary test adopted by the American Bar Association Standards for Criminal Justice, standard 7-5.3(b) (1984):
The test for determining the competence to waive counsel and to represent oneself at trial should be whether the defendant has the present ability to knowingly, voluntarily and intelligently waive the constitutional right to counsel, to appreciate the consequences of the decision to proceed without representation by counsel, to comprehend the nature of the charge and proceedings, the range of applicable punishments, and any additional matters essential to a general understanding of the case.
Assuming the propriety of utilizing this test, Muhammad argues that the trial judge failed to adequately determine that he was competent. The alleged primary indicators that Muhammad was incompetent are his refusal to raise the insanity defense and his failure to introduce any evidence of his psychological problems in mitigation during the penalty phase. Appellate counsel also points to Muhammad's repeated insistence on being referred to in court and in the style of the case by his Moslem name and his rambling discourses during hearings and at trial.
We reject the argument of counsel. In Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court found that the defendant should have been allowed to waive counsel because "[t]he record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." 422 U.S. at 835, 95 S.Ct. at 2541. This is the appropriate standard to apply in the instant case, Jones v. State, 449 So.2d 253 (Fla.), cert. denied, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), and the record supports Muhammad's waiver.
Judge Chance conducted a lengthy and detailed inquiry pursuant to the requirements of Faretta before accepting Muhammad's waiver with this finding:
I personally think you're making a mistake, I really do, but that is your decision. And I'm convinced from talking with you and from the time we spent here today that you're competent and *975 capable to make a mistake. Everybody can make a mistake. I made a mistake last week and blew the engine on my car. I can do that. You can make a mistake just like I did.
If you want to, and all I want to make sure today is, that you know what you're doing and that's what you want to do. Now, I'm not going to stand in your way, although I don't think you're making a good decision. But that's  I'm not going on trial and so I don't have that decision to make. So I'm going to grant your motion.
Judge Chance's ruling sums up the dilemma of permitting a defendant to proceed pro se. It also embodies a determination of competency and compliance with the Faretta standard.
The Faretta standard does not require a determination that a defendant meet some special competency requirement as to his ability to represent himself. The Faretta Court noted that the question of whether the defendant had sufficient technical legal skills to represent himself was irrelevant to waiver of counsel. If one may be intellectually incompetent in legal skills yet waive counsel, then no standard of mental competence beyond competence to stand trial is required. Mental competency in the context of Faretta only relates to the ability to waive the right to counsel. Competency may be, however, only one of several factors to be considered when a defendant waives a right, as in the case of waiver of counsel  Faretta requires that the court find that the defendant is not only competent, but also "literate... and understanding, and that he [is] voluntarily exercising his informed free will." 422 U.S. at 835, 95 S.Ct. at 2541. The requirements of literacy and understanding appear to be the factors suggested in Massey, which in combination with competency constitute "capacity to stand trial without benefit of counsel." 348 U.S. at 105, 75 S.Ct. at 145.
Inherent in appellant's argument is the assumption that the level of competency necessary to waive counsel is greater than the level required to simply stand trial. Competency to waive counsel is at the very least the same as competency to stand trial. Faretta. Judge Chance's determination of competency avoided reliance on Dr. Amin's report (to which Muhammad had objected earlier in the hearing). Thus, whatever claim of error that might be raised regarding the initial determination of competency to stand trial in reliance on the Amin report is mooted by Judge Chance's determination without reliance on the report that Muhammad was competent to waive counsel.
Appellate counsel also argues that the judge should have appointed experts for a determination of competency regarding the waiver and self-representation. Counsel claims Muhammad asked for an examination on this point, but it is clear from the context of his statement that his intention was that Dr. Amin consult with him as a defense expert under Florida Rule of Criminal Procedure 3.216(a), and nothing indicates that Muhammad had changed his position regarding the other experts. Also, the Faretta hearing occurred less than a month after the prior determination of competency to stand trial and nothing in the record suggests that Muhammad's mental condition had changed in the interim necessitating another, most likely futile, attempt at expert evaluation.
Appellate counsel's alleged indicia of incompetence are without merit. Muhammad's refusal to cooperate in raising an insanity defense is not in itself an indicator of incompetence. The record shows that Muhammad adamantly refused to seek any excuse for the murder based on his mental condition, apparently based on his interpretation of Moslem teachings that he should take responsibility for his actions. Society permits a defendant to seek refuge in an insanity defense; it does not require it. Cf. Alvord v. State, 396 So.2d 184 (Fla. 1981) (trial counsel not ineffective for failing to convince defendant to plead insanity defense). One might have been legally insane at the time he commits a crime, but, so long as he is subsequently competent to make the decision, he may refuse to seek excuse.
*976 Muhammad's insistence on use of his Moslem name is likewise not an indicator of incompetence. In fact, his attention to this detail is consistent with his entire behavior, which seems to be guided by his interpretation of Moslem dictates. His refusal to shave was apparently based on his perception of religious principle, and the murder may be viewed as his taking a stand on this principle. Insistence on recognition of the Moslem name is another manifestation of Muhammad's desire to stand on principle. A prisoner on death row lives in a world of extremely limited options, and standing on principle on matters such as this, which might appear to be minor annoyances to a free person, can easily take on far greater significance to a prisoner to whom a shaving pass may constitute a victory of will amidst multitudinous defeats.
We have reviewed in detail Muhammad's alleged ramblings at hearings and trial and find them wordy and at times flowery, but they clearly demonstrate an intelligence well aware of what is going on and responding in an appropriate manner.

REMAINING SANITY ISSUES
Appellate counsel next asserts error in the trial court's ruling that appointed trial counsel would be unable to present any evidence of insanity because of the defendant's refusal to cooperate with the court experts. Subsequent to this ruling, Muhammad filed a pro se motion a month before trial to withdraw the notice of intent to raise the insanity defense. The trial court permitted the state to withdraw its motion to strike the insanity defense and granted Muhammad's motion. Muhammad was competent to make the motion and therefore he has waived any claim of error.
Appellate counsel also asserts error in the trial court's failure to find that Muhammad's mental condition was a mitigating factor. However, based on Muhammad's position regarding responsibility for his actions, the trial court was not obliged to infer a mitigating circumstance, contrary to the wishes of a competent defendant proceeding pro se who neither requested mitigation on these grounds nor presented any evidence to support such a conclusion. The trial judge properly considered and rejected finding that the defendant was under the influence of extreme mental or emotional disturbance or suffered from a substantial impairment of the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

AGGRAVATING FACTORS
Muhammad contends that the trial court improperly applied two aggravating factors when it found that he was under a sentence of imprisonment and that he had been convicted of a violent or capital felony. §§ 921.141(5)(a) & .141(5)(b). We have consistently rejected the argument that these two factors improperly double aggravating circumstances. See, e.g., Lusk v. State, 446 So.2d 1038 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); Agan v. State, 445 So.2d 326 (Fla. 1983), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); Williams v. State, 438 So.2d 781 (Fla. 1983), cert. denied, 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 146 (1984).

CONCLUSION
We have reviewed the record and find no fundamental error. Indeed, Muhammad conducted his defense as well as any layman could be expected to do.
Accordingly, the judgment and sentence of the trial court are affirmed.
It is so ordered.
McDONALD, C.J., and ADKINS, BOYD, OVERTON, EHRLICH and SHAW, JJ., concur.
NOTES
[1] Muhammad had been sentenced to death for the murders of a Miami couple. Knight v. State, 338 So.2d 201 (Fla. 1976). Muhammad's original name was Thomas Knight. While imprisoned, the defendant adopted his new name pursuant to his beliefs in Islam. He insisted on use of the new name throughout the proceedings below and, after initial resistance from the judges, succeeded in having the new name placed on the caption of the case.
[2] The rule reads:

(a) When in any criminal case counsel for a defendant adjudged to be indigent or partially indigent, whether public defender or court appointed, shall have reason to believe that the defendant may be incompetent to stand trial or that he may have been insane at the time of the offense, he may so inform the court who shall appoint one expert to examine the defendant in order to assist his attorney in the preparation of his defense. Such expert shall report only to the attorney for the defendant and matters related to the expert shall be deemed to fall under the lawyer-client privilege.