866 So.2d 1195 (2003)
STATE of Florida, Appellant/Cross-Appellee,
v.
Thomas KNIGHT n/k/a Askari Abdullah Muhammad, Appellee/Cross-Appellant.
Thomas Knight n/k/a Askari Abdullah Muhammad, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-1415, SC02-1106.
Supreme Court of Florida.
August 21, 2003.
Rehearing Denied December 19, 2003.
*1198 Charles J. Crist, Jr., Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellant/Cross-Appellee, and Respondent.
Heidi E. Brewer, Registry Counsel, Tallahassee, FL, for Appellee/Cross-Appellant, and Petitioner.
PER CURIAM.
The State appeals a trial court order vacating Askari Muhammad's death sentence and granting a new sentencing proceeding pursuant to Muhammad's Florida Rule of Criminal Procedure 3.850 motion. Muhammad cross-appeals the denial of his claim that he is entitled to have his conviction for first-degree murder vacated and also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we reverse the portion of the trial court's order vacating Muhammad's death sentence.

I. PROCEEDINGS TO DATE
The facts in this case are set forth in this Court's opinion on direct appeal. See Muhammad v. State, 494 So.2d 969, 970 (Fla.1986) (Muhammad I). Briefly stated, Muhammad, who was awaiting execution on death row,[1] fatally stabbed Department of Corrections (DOC) guard James Burke on the afternoon of October 12, 1980. Muhammad was charged with Burke's murder. Before trial, Muhammad's motion to proceed pro se was twice denied by two separate judges, who later recused themselves from the case. Muhammad's first trial ended in mistrial. When Muhammad renewed his motion to proceed pro se, a third judge allowed him to represent himself. The jury found Muhammad guilty as charged and Muhammad waived his right to a jury recommendation in the penalty phase. The trial court sentenced Muhammad to death, finding nothing in mitigation and three aggravating circumstances: the defendant was under sentence of imprisonment, he had been convicted of a prior capital felony, and the murder was heinous, atrocious or cruel. See Muhammad I, 494 So.2d at 972. On direct appeal, this Court affirmed Muhammad's judgment and sentence.[2]Id. at 976. The Supreme Court denied certiorari in Muhammad v. Florida, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987).
In February of 1989, Muhammad filed his 3.850 motion with eighteen claims, each of which was summarily denied by the trial court. See Muhammad v. State, 603 So.2d 488 (Fla.1992) (Muhammad II). On appeal of the trial court's order, Muhammad sought review of fifteen rejected claims.[3] *1199 Id. This Court affirmed the trial court's summary denial of all of Muhammad's claims except one, and remanded on a limited issue regarding Muhammad's Brady[4] claim:
[W]e agree with Muhammad that summary denial was improper as to the State's alleged failure to disclose exculpatory employee statements in violation of Brady v. Maryland, (part of claim 9). Gorham v. State, 521 So.2d 1067 (Fla. 1988). In summarily denying this claim, the trial court stated that "this is an issue that should have been raised on direct appeal." However, some claims arising under Brady are proper in a rule 3.850 motion. Demps v. State, 416 So.2d 808 (Fla.1982). In this case, Muhammad alleges that despite his repeated requests for discovery the State suppressed exculpatory statements of prison employees who witnessed the offense. He further alleges that the State insisted that it had no such statements, when in fact there were such employee statements. Muhammad contends that these statements contained exculpatory information regarding his mental state at the time of the offense, and that he was denied his right to effectively cross-examine witnesses against him based on the statements. Because the trial court believed that this point was inappropriate to a rule 3.850 proceeding, it did not address the merits of whether the alleged Brady violation would require a new trial. Accordingly, we reverse the *1200 trial court's ruling on the alleged Brady violation and remand to the trial court for an evidentiary hearing on this issue.
Muhammad II, 603 So.2d at 489-90.
After a protracted exchange of pleadings concerning public records requests, the trial court held an evidentiary hearing on the Brady claim on June 12 and 13, 2000. At the hearing, the defense introduced several exhibits relating to alleged Brady evidence. In particular, Muhammad introduced various documents that were apparently part of the Department of Corrections (DOC) investigatory file on Burke's murder. The documents included employee and inmate statements that were taken during the course of the investigation. Among these documents was a letter dated June 2, 1981, from L.E. Turner, an investigator with DOC, to the prosecutor in the case, Thomas Elwell. In the letter, Turner indicated that he had, at Elwell's request, reinterviewed and received the statements of Florida State Prison (FSP) personnel who had the closest contact with Muhammad immediately following the murder of Officer Burke. Attached to the letter were seven typed unsigned, undated, and unattributed statements. Additionally, at the evidentiary hearing, Muhammad introduced testimony from a number of witnesses, including several witnesses that testified as to the import of the June 2, 1981, letter and its attached statements.[5]
After the evidentiary hearing, the trial court entered an order dated May 8, 2001, which found that Muhammad was entitled to a new sentencing hearing, and denied all other requested relief.

II. 3.850 MOTION

A. State's Appeal
Initially, we would note that the scope of our previous remand was narrow. Specifically, we remanded for an evidentiary hearing to determine whether the State failed "to disclose exculpatory employee statements in violation of Brady v. Maryland." Muhammad II, 603 So.2d at 489. Accordingly, the trial court recognized that much of the evidence that Muhammad introduced at the evidentiary hearing and the arguments associated therewith were not germane to the issue at hand. In fact, *1201 given the large amount of additional information that was introduced, it was unclear from the evidentiary hearing and from the trial court's order which evidence Muhammad was alleging was Brady evidence. At oral argument, Muhammad identified the documents that his Brady claim was premised on: the June 2, 1981, letter from Turner and the statements attached to it.
The State is required to disclose to the defense evidence in its possession or control that is favorable to the accused or that tends to negate the guilt of the accused. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant must prove three elements to establish a Brady claim: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence has been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). In assessing the prejudice element of a Brady claim, a court should determine whether the favorable evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); see also Occhicone v. State, 768 So.2d 1037, 1041 (Fla.2000). Furthermore, in reviewing whether prejudice has ensued, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936.
The trial court's order does not analyze Muhammad's claim according to the three elements necessary to prove a Brady claim.[6] Moreover, it is not clear *1202 from the evidence adduced at the evidentiary hearing that the State suppressed the letter and its attached statements, either willfully or inadvertently. Bernstein, Muhammad's attorney before he elected to proceed pro se, testified that he did not recall the letter or its attached statements and that he probably would have remembered receiving such documents because he would have turned them over to mental health experts. However, Bernstein also acknowledged that he had forgotten receiving other documents that the State could prove had been turned over.[7]
Nevertheless, even if we were to assume that the State had either willfully or inadvertently suppressed the letter and its attached statements, we would still hold that Muhammad has not demonstrated that he was prejudiced and thus, his claim fails under the third prong of the Brady test. At best, the seven unattributed, unsigned, and undated statements contain limited and conflicting information regarding Muhammad's state of mind around the time of the murder.[8] Moreover, although the descriptions of Muhammad in the statements were unsigned, they were consistent with the descriptions given by FSP personnel who were deposed by Bernstein. Thus, as the State notes, the information contained in the allegedly suppressed employee statements was cumulative to information from employee depositions. The record reflects that those depositions were turned over to Muhammad, yet he did not use them to present any mental mitigation. Under these circumstances, no likelihood that Muhammad would have used the similar and cumulative information in the June 2, 1981, letter and its attachments to argue mental mitigation has been established. In addition, there has been no demonstration that the allegedly withheld documents contained any information not already disclosed *1203 to Muhammad by other means. Therefore, because Muhammad did not suffer any prejudice from the alleged withholding of the letter and its attached statements, the trial court erred in ordering a new penalty phase.

B. Muhammad's Appeal
Muhammad's cross-appeal is closely related to the issues appealed by the State. Namely, Muhammad alleges that the evidence of the letter and employee statements requires his conviction to be vacated. Muhammad argues that the lower court did not consider the impact of this evidence upon the guilt phase with regard to issues such as whether he would have pursued an insanity defense and whether he was competent to proceed pro se.
Although our opinion in Muhammad II indicated that the trial court had not addressed the merits of "whether the alleged Brady violation would require a new trial," Muhammad II, 603 So.2d at 490, the nature of the documents that were presented on remand would not require either a new sentencing phase or a new trial. Thus, we agree with the trial court's denial of guilt phase relief. Even if the documents in question were suppressed by the State, they would not have provided any novel information that would have had any impact on guilt phase issues. We previously concluded, after explaining in some detail in Muhammad's direct appeal, that the trial court properly found that Muhammad was (1) competent to stand trial, (2) competent to proceed pro se, and (3) competent to withdraw the notice of intent to raise an insanity defense. Muhammad I, 494 So.2d at 974-76. Nothing contained in the alleged Brady documents causes us to question these conclusions. As we recognized, Muhammad "conducted his defense as well as any layman could be expected to do." Id. at 976. Therefore, the lower court properly denied relief regarding the guilt phase.

III. HABEAS
In the petition for writ of habeas corpus, Muhammad asserts five claims of ineffective assistance of appellate counsel.[9] As his first claim, Muhammad argues that his appellate counsel was ineffective for failing to raise any issues on appeal regarding the alleged limitations put on the participation of Muhammad's standby counsel, Fredrick Replogle (Replogle). At the evidentiary hearing on Muhammad's 3.850 motion, Replogle adopted an affidavit that had been submitted with Muhammad's previous 3.850 motion. The affidavit alleged that Replogle did not consult with Muhammad during the trial, did no investigation, was totally unaware of Muhammad's background, and had been ordered by the trial judge not to consult with Muhammad.
Appellate counsel's ineffectiveness is appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). In *1204 order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine the following:
[F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069. Moreover, appellate counsel cannot be deemed ineffective for failing to pursue a meritless claim. See Johnson v. Singletary, 695 So.2d 263, 266-67 (Fla.1996).[10]
At the outset, Muhammad's characterization of the facts involved with the participation of his standby counsel are incorrect. Despite Muhammad's claim that standby counsel was not permitted to assist him, at the start of the trial, the court specifically informed Muhammad of Replogle's presence in the courtroom and told Muhammad that if he needed assistance, Replogle was available.[11] Moreover, before the jury was instructed, the following discussion on Muhammad's decision not to utilize Replogle took place:
MR. REPLOGLE: I have offered to assist the defendant in reviewing the instructions. Could we, perhaps, go into the library to do that rather than back to the holding cell?
COURT: You have consistently refused the Court's offer of Mr. Replogle's assistance. I don't want to force anything upon you.
MR. MUHAMMAD: Your honor, I want to go on the record as understanding the Court. I[sic] have entered an order denying my request for assistance of counsel. I want the record to reflect, it is my understanding that the Court entered an order appointing Mr. Replogle as standby counsel in this case. Mr. Replogle, he asked that did I want him to assist me in reviewing these instructions, and I stated to him that it was not necessary, that if he wanted to review these instructions, he is welcome to do *1205 so. However, I don't want to intimate in any way that Mr. Replogle is assistant [sic] of counsel because Mr. Replogle has not assisted me in this cause.
COURT: I understand, that's what I wanted to record. Mr. Replogle, under those circumstances, I don't think that you should. Mr. Muhammad, I have asked Mr. Replogle to be here as standby counsel in the event that you cannot proceed.
MR. MUHAMMAD: Yes, sir.
COURT: I also asked him to be here in the event that you needed some legal jury [sic] and that he would provide that, upon your request, only upon your request, in that I didn't because of our previous concerns about this that you have a right to represent yourself. The Court in no way is forcing counsel upon you. As a result, if you request it, Mr. Replogle assisting you in going over those jury instructions, he indicated to me that he is willing to do so, but without your request, I ask Mr. Replogle to remain in his seat away from you so it does not appear that you are represented by counsel or that he is participating in any way.
Thus, it is clear from the record that Muhammad did not want to appear to have acquiesced to the limited role that his standby counsel was performing. Moreover, the court took seriously Muhammad's desire not to insinuate that Replogle was providing him any assistance. Muhammad's decision to not avail himself of his designated standby counsel, even though he was aware Replogle was available, was his own, and not the trial judge's decision. In McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the United States Supreme Court stated:
First, the pro se defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the Faretta[12] right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the Faretta right is eroded.
Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear pro se exists to affirm the accused's individual dignity and autonomy.
Id. at 178, 104 S.Ct. 944 (footnote omitted).[13]
In the instant case, Muhammad's remark that he "did not want to intimate" that Replogle was providing him with any assistance demonstrates that Muhammad did not want Replogle's assistance and he wanted to make sure that there was no insinuation or appearance that Replogle was in any way acting as his counsel. Any limitation that the trial court put on standby counsel was apparently based on Muhammad's repeatedly stated desire that he be allowed his right to self-representation *1206 unimpeded. Therefore, Muhammad is not entitled to relief on this claim.

ABSENCE FROM PROCEEDINGS
Next, Muhammad claims that his appellate counsel was ineffective for failing to raise on appeal the issue of two alleged incidents of ex parte communications with the State, which occurred during the penalty phase of Muhammad's trial.[14] The first ex parte communication that Muhammad alleges occurred took place during the sentencing phase when the record reflects that Muhammad may have been removed from the courtroom before a presentencing investigation (PSI) was ordered.[15] Muhammad's second allegation of ex parte communication stems from a sidebar conference while the court was delivering its sentencing announcement.[16]
We disagree with Muhammad's claim that appellate counsel was ineffective. Notably, Muhammad was physically present in the courtroom in both instances and the record does not reflect that Muhammad was actually removed from the courtroom in the first instance. On neither occasion did Muhammad object to being excluded from the process, even though he was present in the courtroom *1207 and would have had the opportunity to do so.
Nevertheless, even if we were to conclude Muhammad was absent in both instances, we would deem these absences harmless. Muhammad claims his case is akin to Proffitt v. Wainwright, 685 F.2d 1227, 1255-1256 (11th Cir.1982), where the Eleventh Circuit determined that a defendant's absence during a pretrial hearing was harmful error. However, the defendant in Proffitt was absent from the entire hearing, at which the State and defense were offering arguments on court-ordered psychiatric reports. Id. at 1257. The Eleventh Circuit refused to find the defendant's absence harmless, in part because if the defendant had been present he could have informed his attorney and doctors that he was taking antipsychotic medication during the time he was being observed for the preparation of the reports. Id. at 1260-61. In the instant case, the alleged absences were of a much more brief duration than that which occurred in Proffitt and, while he may have been briefly absent from proceedings, Muhammad was present in the courtroom and would have understood from the context that he either should object or present arguments. Assuming he was taken from the courtroom in the first instance, Muhammad's absence from the brief portion of the trial where the judge ordered the PSI was harmless. In the second instance, even if Muhammad was absent from the sidebar, the court implicitly presented Muhammad an opportunity to respond by explaining what had occurred during the sidebar. Given Muhammad's ineffectual penalty phase argument and failure to present any mitigation, his presence on either occasion would not have served the purpose that the defendant's presence would have served in Proffitt.
Because the result of either alleged absence was harmless, appellate counsel's decision not to appeal this issue is not "of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance." Pope, 496 So.2d at 800.

ACCESS TO LAW LIBRARY
Next, Muhammad alleges that his appellate counsel was ineffective for failing to raise a claim based on the facts surrounding limits on Muhammad's access to the prison law library. We disagree. The facts associated with this case necessarily limited Muhammad's options for defense because there was no issue of identity. Moreover, Muhammad had chosen the additional self-imposed limitation of waiving any reliance on an insanity defense and electing to proceed pro se.[17] Before trial, Muhammad filed a "Motion to Use Law Library" arguing that he should be allowed to physically go and use the law library. At a hearing on the motion, Muhammad *1208 explained that he had requested to use the law library at FSP from 1 a.m. to 3 a.m., but the prison superintendent had not replied to his request. For the record, the trial court asked Muhammad if he was denied all access to the FSP law library, and Muhammad explained that he could request materials from the law library, but he could not go to the law library in person. At the hearing, the court asked Muhammad what legal materials he had been denied, and Muhammad replied that he had requested a case from the Atlantic Reporter, but the library did not have the Atlantic Reporter. Muhammad did not refer to any other requested material and said that the law library should have to get a copy of the material in question because of his incarcerated status. Ultimately, Muhammad's motion was denied.
Clearly, FSP was under no obligation to grant Muhammad's request for physical access to the law library in the middle of the night.[18] However, we do not need to reach whether FSP's policy provided adequate access to the law library, because Muhammad has failed to show any prejudice from the policy. Muhammad was given access to the legal materials in the library by request. The only legal material that Muhammad could identify that was not given to him under FSP's policy was a copy of an unspecified case in the Atlantic Reporter, which was unlikely to have law relevant to Florida and would not have assisted Muhammad in preparing his defense. Therefore, Muhammad's appellate counsel was not ineffective for failing to raise this claim on appeal.

CHANGE OF VENUE AND METHOD OF VOIR DIRE
Next, Muhammad argues that appellate counsel was ineffective for failing to *1209 raise a claim on direct appeal regarding change of venue and individualized voir dire of members of the jury pool. In selecting the jury, the trial court utilized a hybrid method of jury selection whereby the court would ask if any member of the jury had heard anything about the case, to which the members would respond simply affirmatively or negatively. Those who responded affirmatively were then sent out and individualized voir dire was conducted with those members.
With regard to when a change of venue is necessary to protect a defendant's rights, the Court has provided the following test:
The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
Rolling v. State, 695 So.2d 278, 284 (Fla. 1997) (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)). When a motion for change of venue is filed a trial court should evaluate "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." Id. at 285. Furthermore, the existence of pretrial publicity in a case does not necessarily lead to an inference of partiality or require a change of venue; rather, pretrial publicity must be examined with attention to a number of circumstances, including (1) when the publicity occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community exposed to the publicity; and (5) whether the defendant exhausted all of his peremptory challenges in seating the jury. See Foster v. State, 778 So.2d 906, 913 (Fla.2001); Rolling, 695 So.2d at 285. Furthermore, decisions on a motion for a change of venue are firmly within the trial court's discretion and will not be overturned on appeal absent a palpable abuse of discretion. Kearse v. State, 770 So.2d 1119, 1124 (Fla.2000).
In the postconviction context where the defendant is claiming that trial counsel was somehow ineffective with regard to venue, a court can examine counsel's performance for deficiency and, when assessing the prejudice prong of Strickland:
[T]he defendant must, at a minimum "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court." Meeks v. Moore, 216 F.3d 951, 961 (11th Cir.2000); see also Provenzano v. Dugger, 561 So.2d 541, 545 (Fla.1990) (concluding that counsel was not ineffective for failing to renew the motion for change of venue because it was a tactical decision and because "it is most unlikely that a change of venue would have been granted because there were no undue difficulties in selecting an impartial jury").
Wike v. State, 813 So.2d 12, 18 (Fla.2002).
In the instant case any omission by appellate counsel in failing to present an issue regarding venue on appeal is not "of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance." Pope, 496 So.2d at 800. Although there may have been some publicity surrounding the murder of Officer Burke, an independent review of the record demonstrates that there was no difficulty in seating the jury.
*1210 Under these circumstances, the trial court's decision to deny Muhammad's various motions for change of venue and select the jury in Bradford County does not amount to a "palpable" abuse of discretion. See Kearse, 770 So.2d at 1124. Therefore, any deficiency in failing to raise this issue on appeal does not appear to be so serious or substantial that appellate counsel's failure to raise the issue fell outside the range of professionally acceptable performance.
With regard to the issue of individual voir dire, Muhammad's argument is without merit. The reason that Muhammad requested individual voir dire was to prevent members of the venire from tainting others with any knowledge of the case. The selection process that the trial court utilized, which allowed the judge to test for previous knowledge of the case without tainting the jury pool, addressed Muhammad's concerns. Under these circumstances, appellate counsel was not ineffective for failing to raise this claim.

ALLEGED GRAND JUROR BIAS
Next, Muhammad claims his appellate counsel was ineffective for failing to raise an issue regarding the alleged bias of the grand jury that indicted him. Before trial, Bernstein filed a motion to abate the indictment because several of the individuals on the grand jury were allegedly employed by the Department of Corrections or had been employed by the Department of Corrections, or had close relatives who were employed by the Department of Corrections. In Rogers v. State, 511 So.2d 526 (Fla.1987), this Court rejected an appellant's claim that a member of his grand jury was biased, because "[e]ven assuming arguendo that this grand juror was biased and participated in returning the indictment, the petit jury's subsequent guilty verdict rendered any resulting error presumptively harmless." Id. at 531; see also Porter v. Wainwright, 805 F.2d 930, 941-42 (11th Cir.1986). Therefore, even if Muhammad's grand jury was biased, the fact that he was subsequently convicted by the petit jury would render any error in allowing biased members on the grand jury presumptively harmless. Moreover, there was ample evidence to show probable cause to indict Muhammad for the charge in question. Thus, regardless of potential bias by the grand jury, probable cause existed to indict Muhammad on this charge even by a non-biased grand jury. Cf. Cummings v. State, 715 So.2d 944, 947 (Fla.1998) (holding that there was no error in failure to dismiss indictment where defendant argued the indictment was based on perjured testimony because there was other sufficient evidence showing probable cause to indict). Therefore, we deny relief on this claim.

IV. CONCLUSION
In sum, we affirm the portion of the trial court's order denying the motion to vacate Muhammad's conviction, but reverse the portion of the trial court's order vacating Muhammad's death sentence and remand with directions that Muhammad's death sentence be reinstated, and we deny the petition for writ of habeas corpus.[19]
It is so ordered.
*1211 ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Muhammad was on death row for the murders of Lillian and Sydney Gans. See Knight v. State, 338 So.2d 201 (Fla.1976). Prior to changing his name, Muhammad was known as Thomas Knight.
[2] On direct appeal, Muhammad's appellate counsel raised five claims: (1) the trial court erred in finding Muhammad competent to stand trial as it had insufficient facts upon which to find him competent; (2) the trial court erred in allowing Muhammad to represent himself at trial without first determining his competence to waive assistance of counsel and to represent himself; (3) the trial court erred in excluding Muhammad from presenting any evidence of his insanity at trial because he refused to be examined by court-appointed psychiatrists in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution; (4) the trial court erred in finding as aggravating factors that Muhammad was under sentence of imprisonment when he committed the murder and that he had a conviction for a prior felony; (5) the trial court erred in failing to consider in mitigation evidence of Muhammad's mental status.
[3] Noting that Muhammad had combined and rearranged many of the eighteen claims presented to the trial court, this Court summarized the fifteen claims:

Of the eighteen claims presented in his 3.850 motion, Muhammad seeks review of the trial court's rejection of the following fifteen: 1) that summary denial was erroneous and the trial court erred in failing to either identify or attach the portion of the record that refutes each claim; 2) that Muhammad's rights were violated because no reliable transcript of the trial exists and critical records were not included in the record on direct appeal; 3) that Muhammad was denied effective assistance of counsel in violation of Faretta[ v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)]; 4) that Muhammad was denied due process and equal protection because the appointed mental health expert failed to conduct a professionally competent evaluation and this in turn caused counsel to render ineffective assistance; 5) that Muhammad was denied effective assistance of counsel by the court's order that defense counsel not present an insanity defense; 6) that Muhammad's rights were abrogated because he was forced to undergo criminal judicial proceedings although he was not legally competent; 7) that the death sentence was unreliable because Muhammad was not competent to waive his sentencing jury yet the penalty proceedings were not conducted before an advisory jury; 8) that Muhammad was denied his rights as a pro se defendant at both the guilt and penalty phases of the trial; 9) that state misconduct throughout the guilt and penalty phases denied Muhammad's right to a fundamentally fair and reliable capital trial and sentencing determination; 10) that the trial court's denial of Muhammad's motions for change of venue and for individual, sequestered voir dire deprived him of his right to a fair and impartial jury; 11) that Muhammad was indicted by a biased grand jury; 12) that the trial court erred in failing to consider Muhammad's mental deficiencies as nonstatutory mitigating circumstances and in considering nonstatutory aggravating factors; 13) that the trial court unconstitutionally shifted the burden of proof with regard to the appropriateness of a sentence of life imprisonment; 14) that the jury and judge improperly considered the victim's character and "victim impact" information; and 15) that the "heinous, atrocious, or cruel" aggravating circumstance was applied without articulation or application of a meaningful narrowing principle in violation of Maynard[ v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)].
Muhammad II, 603 So.2d at 488-89 (footnotes omitted).
[4] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[5] Muhammad introduced the testimony of twelve individuals. Louis E. Turner, a DOC investigator at the time of the Burke murder and the author of the letter to the prosecutor, testified and authenticated that a number of documents appeared to be from his investigatory file on the case. Leonard Ball, Edward Sands, and Ed Sobach were officials with FSP and DOC who testified as to the state of the files in the Burke murder as well as the possible location of documents that appeared to be missing from the investigatory files. Darrell Brewer, who worked for FSP as a guard at the time of the murder, testified that Muhammad's eyes were open wide when he observed him shortly after the murder. Arthur Jones, Lenson Hargrave, and Boyd McCaskill were inmates that saw Muhammad around the time of the crime. They each testified as to their observations of Muhammad around the time of the crime. However, none had previously shared their observations with the State. Brad Fisher was a clinical forensic psychologist, who had examined Muhammad. He testified that the June 2, 1981, letter and attached statements would have been useful in diagnosing Muhammad's potential mental illness and would have supported mitigation. Reed Replogle was Muhammad's standby counsel at the time of his trial. He testified that he had no contact with Muhammad during the trial and he alleged that the judge had given him specific orders not to approach the defendant. Stephen Bernstein was Muhammad's counsel before he elected to proceed pro se. Bernstein testified that he and Muhammad differed on trial strategy in that he wanted to present an insanity defense but Muhammad refused. Bernstein had also examined the Brady material and he said it would have been useful in preparing for guilt phase and penalty phase issues. Bill Salmon testified as an expert on defense in the State of Florida. He opined that the alleged Brady material would have been useful at each stage of the trial.
[6] Although we remanded for the trial court to determine whether the State failed to disclose employee statements in violation of Brady, the materials that the trial court relied on in its order granting relief encompassed information that was not suppressed by the State because it was either not in the State's possession or because it was, in fact, generated by the defense by way of deposition. For example, in a portion of the order, the trial court stated:

The information cited by Defendant as newly discovered centers around observations by inmates and guards of Defendant's demeanor at or near the time of the crime as evidence of his mental state. Just hours after the incident, inmates were interviewed (the interviews were later transcribed), and the correctional officers involved completed incident reports detailing their involvement in the event. Defendant argues that the statements made during the interviews and in the incident reports would have enabled him to show that he was not functioning normally at the time this event occurred.
For example, at the evidentiary hearing, Defendant put on a number of witnesses who testified that Defendant appeared not to be in his right mind just before and after the murder.
After referring to the evidentiary hearing testimony of one correctional officer and two inmates, who described Muhammad's appearance at the time of the murder, the trial court stated that Muhammad was arguing "that had this information been disclosed to him, it would have drastically affected his trial strategy and preparation, and the outcome of the proceedings would have been different."
Although the testimony of the correctional officer could conceivably be matched to one of the unattributed statements attached to the June 2, 1981, letter, the trial court's order did not do so. Moreover, the two inmates testified specifically that they had not relayed their observations to anyone until just before the evidentiary hearing. Therefore, because they had never shared their observations with the State, it is unclear how the inmate's observations could be considered Brady evidence.
Moreover, in another portion of the order, the trial court states that the "information relied upon by Defendant appears only in depositions, incident reports, and interviews, which were not made part of the official court record. Thus, the sentencing court could not have known of its existence unless brought to its attention by either side." Although the "depositions, incident reports, and interviews" are not referred to with any specificity, the evidentiary hearing demonstrated some incident reports and taped interviews had been turned over to Muhammad's counsel, Bernstein, who then turned his files over to Muhammad when he was allowed to proceed pro se. Moreover, the depositions, although not identified with any specificity, would appear to be ones taken by Bernstein before he withdrew as counsel. These depositions were also apparently turned over to Muhammad, as he made references on the record that would indicate he was utilizing them. This information was clearly not suppressed by the State because it was prepared by Muhammad's counsel and was apparently in Muhammad's possession.
[7] In general, the evidentiary hearing demonstrated that the passage of time has had somewhat of a debilitating effect on the determination of what information that State and Muhammad had in their respective possession at the time of trial.
[8] In fact, in reviewing the contradictory nature of the statements it is difficult to say definitively that the statements satisfy the first prong of Brady, namely that they are favorable to the accused as either exculpatory or impeaching. For example, one statement cited by Muhammad in his brief described Muhammad's facial expression as "it appeared to say I've done something terrible, his eyes appeared to be stretched at an unusual size." However, the same statement notes that Muhammad "appeared as if he had nothing to worry about.... [His] facial expression showed no regrets and no remorse." Another describes Muhammad as "looking down at Officer Burke with a blank expression on his face." However, the same individual also stated that "[a]t no time did [Muhammad] appear not to know what was happening or where he was at, his response to all orders given to him were responded to without question or delay."
[9] Muhammad claims appellate counsel was ineffective for failing to raise the following claims: (1) Muhammad's Sixth, Eighth, and Fourteenth Amendment rights were violated when the court instructed his standby counsel not to provide him with assistance; (2) Muhammad's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated because he was not present at critical stages of the proceedings and the trial court engaged in ex parte communications with the State during these absences; (3) Muhammad was denied access to a law library to prepare his defenses; (4) the trial court's failure to grant Muhammad's motions for change of venue and individual sequestered voir dire deprived Muhammad of his right to a fair and impartial jury in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (5) Muhammad was indicted by a biased grand jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
[10] On appeal, this Court held that the trial court appropriately found that Muhammad was competent to proceed pro se and waive his right to counsel. Muhammad v. State, 494 So.2d 969, 974 (Fla.1986). Thus to the extent that any of Muhammad's habeas petition claims can be construed as an attack on the trial court's decision to allow Muhammad to proceed pro se, his claims are procedurally barred. See Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which ... were raised on appeal....").
[11] Specifically, the trial court stated: "If you have any questions during the course of the trial, I know you have not used Mr. Replogle of the Public Defender's Office much in the past, but if you have any questions, Mr. Replogle is present to assist you." When Muhammad asked the judge to clarify Replogle's role, the judge responded, "If you have any questions about legal proceedings that are going on in the courtroom, you may ask Mr. Replogle a question. That seems clear enough," to which Muhammad responded, "Okay, Your Honor." The next day, Muhammad objected "to the Court's offer that I use Mr. Replogle because if I'm not mistaken, this Court entered an order appointing the office of the Public Defender as standby counsel, not assistance of counsel." While lacking some clarity, Muhammad's objection was apparently based on his desire to make it clear that he did not acquiesce to the trial court's offer to use Replogle in the role of standby counsel.
[12] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[13] The Supreme Court also recognized that excessive involvement of standby counsel in front of the jury "will destroy the appearance that the defendant is acting pro se. This, in turn, may erode the dignitary values that the right to self-representation is intended to promote and may undercut the defendant's presentation to the jury of his own most effective defense." Id. at 181-82, 104 S.Ct. 944.
[14] In a footnote, Muhammad's brief indicates that he was not present for the excusal of two jurors and that he was also absent when the manner of conducting voir dire was decided. However, Muhammad has not identified with any specificity how he was absent for the excusal of the jurors and no such absence is apparent on the face of the record. Moreover, the record also clearly reflects that the manner of voir dire was determined at an October 11, 1982, hearing. Not only was Muhammad present at this hearing, it was conducted after he had been allowed to proceed pro se and he was able to offer objections to and arguments against the State's proposed method of conducting voir dire.
[15] Immediately after Muhammad was finished presenting his closing argument, the record reflects that the trial court stated:

Thank you. Take the defendant out first, the evidence and arguments of counsel, I find that the State has established at least several of the aggravating circumstances that are required by the law of the State of Florida with regard to the imposition of the death penalty beyond and to the exclusion of every reasonable doubt. I have found that the defendant has elected not to present any evidence of testimony with regard to any mitigating circumstances. I have searched my mind and the record to find, during the course of the proceeding, that I cannot find that there are any mitigating circumstances. I have listened to the defendant's arguments through today and find that he has failed to mention, during his argument, any mitigating circumstances in this matter. On the other hand, I believe that the Court's responsibility in a matter like this is a grave one and a responsibility that cannot be hastily entered into. As a result, I have requested a presentence investigation to be independently prepared for the Court to review to determine where there exists any basis for any mitigating circumstances in this case. At the conclusion of the presentence investigation and the filing of this Court, I will schedule a sentencing proceeding.
[16] Muhammad's argument suggests that he was not present at multiple sidebar discussions. However, he only identifies one instance with any specificity. During the pronouncement of sentence, after the court announced that it found no statutory mitigation and sentenced Muhammad to death, the following colloquy took place:

MR. HEBERT: May we approach the Bench, Your Honor?
THE COURT: Yes.
* * *
(Side-bar conference between the Court, Mr. Hebert and Mr. Elwell without reporter)
* * *
THE COURT: For the record, the State Attorney's Office indicates that although there are no statutory mitigating circumstances, the court also can consider other outside mitigating circumstances. The Court finds no other outside mitigating circumstances.
MR. HEBERT: Thank you, Your Honor.
[17] Indeed, before he elected to proceed pro se, Muhammad was specifically and repeatedly warned that he was likely to encounter problems investigating his case and doing legal research because of the circumstances of his incarceration. At a pretrial hearing in January of 1981, the judge told Muhammad: "You are incarcerated, you are charged with the killing of a man who was in charge of your incarceration.... [I]t is not physically possible for you, because of your incarceration to do the legal research someone should do for you." The judge also suggested Muhammad would be "well advised to accept Mr. Bernstein's representation" and said that Muhammad would likely need a lawyer to "get law books" and for the lawyer's knowledge to prepare a defense.

At the June 7, 1982, Faretta hearing, the trial court again explained to Muhammad that he would not be free of restrictions, that he would not have the same ability to conduct investigations and research as an attorney who was not incarcerated, and would be subject to severe difficulties as a pro se defendant.
[18] In Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the United States Supreme Court held that a prison regulation impinging on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. 2254 (stating that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration"). In Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828, 97 S.Ct. 1491. However, in Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court considered the application of Bounds and Turner to Arizona inmates who were in "lockdown." Id. at 361, 116 S.Ct. 2174. The Court noted that the inmates in lockdown were the most dangerous and violent prisoners in the Arizona prison system. Id. The district court found that lockdown prisoners were "routinely denied physical access to the law library," id. at 347, 116 S.Ct. 2174, and "routinely experience[d] delays in receiving legal materials or legal assistance, some as long as 16 days." Id. at 362, 116 S.Ct. 2174. Nevertheless, the Supreme Court found that the district court had erred in failing to accord adequate deference to prison authorities, and that "so long as [delays in receiving legal materials or assistance] are the product of prison regulations reasonably related to legitimate penological interests, such delays are not of constitutional significance, even where they result in actual injury." Id. at 362, 116 S.Ct. 2174.

The procedure used by FSP to allow Muhammad access to the law library is similar to the procedure in Arizona that was tacitly approved by the United States Supreme Court. See id. at 361[, 116 S.Ct. 2174]. On its face, FSP's policy of not allowing inmates like Muhammad, who was charged with murdering a FSP employee, to have physical access to the library would appear to be reasonably related to a legitimate penological interest, i.e., the safety of employees.
[19] We acknowledge that, although the trial court's order does not provide a basis for Brady relief and our remand was on this narrow basis, the order does demonstrate that the judge undoubtedly believed there was mitigating evidence that had not been considered, and that this mitigating evidence might have influenced his decision to impose the death penalty. However, Muhammad has not demonstrated a valid legal claim on this matter.