995 So.2d 233 (2008)
Alvin Leroy MORTON, Appellant,
v.
STATE of Florida, Appellee.
Alvin Leroy Morton, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC06-2091, SC07-1201.
Supreme Court of Florida.
August 28, 2008.
Rehearing Denied November 18, 2008.
*235 Marie-Louis Samuels Parmer, Nathaniel Edwin Plucker, and Maria E. Deliberto, Assistant Capital Collateral Regional Counsel, Middle Region, Tampa, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Alvin LeRoy Morton appeals an order of the circuit court denying his motion to vacate his sentences of death[1] filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set forth below, we affirm the trial court's denial of postconviction relief and deny the petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
The Court set forth the facts of this case in its direct appeal opinion as follows:
In the late evening of January 26 or early morning of January 27, 1992, appellant Alvin LeRoy Morton, accompanied by Bobby Garner and Tim Kane, forcibly entered the home of John Bowers and his mother Madeline Weisser. Two other individuals, Chris Walker and Mike Rodkey, went with them to the house but did not enter. Morton carried a shotgun and one of the others possessed a "Rambo" style knife. They began looking around the living room for something to take when Bowers and Weisser entered the room from another area of the house. Morton ordered the two of them to get down on the floor, and they complied. Bowers agreed to give them whatever they wanted and pleaded for his life but Morton replied that Bowers would call the cops. When Bowers insisted that he would not, Morton retorted, "That's what they all say," and shot Bowers in the back of the neck, killing him. Morton also attempted to shoot Weisser, but the gun jammed. He then tried to stab her, but when the knife would not penetrate, Garner stepped on the knife and pushed it in. Weisser ultimately was stabbed eight times in the back of the neck and her spinal cord was severed. Before leaving the scene, either Garner or Morton cut off one of Bowers' pinky fingers. They later showed it to their friend Jeff Madden.
Acting on a tip, police and firefighters went to the victims' residence, where the mattresses had been set on fire, and discovered the bodies. Morton was later found hiding in the attic of his home. *236 The murder weapons were discovered underneath Garner's mother's trailer. Morton later confessed to shooting Bowers and helping make the first cut on Weisser.
Morton was convicted on both counts of first-degree premeditated murder. The jury recommended death on both counts by a vote of 11-1.
Morton v. State, 689 So.2d 259, 260-61 (Fla. 1997). On direct appeal, this Court affirmed the convictions but reversed the sentences, finding error in the fact that the State repeatedly introduced the out-of-court statements of its own witnesses during the penalty phase in order to impeach them with prior inconsistent statements. Id. at 261, 264-65. Based on this impermissible use of impeachment, the Court remanded to the trial court for a new penalty phase proceeding. Id. at 265.
At resentencing, the jury again recommended the death penalty by an eleven-to-one vote on each murder. The trial court, agreeing that the aggravators outweighed the mitigators, sentenced Morton to death.[2]
Morton filed his second direct appeal, raising four claims.[3]Morton v. State, 789 So.2d 324, 329 (Fla.2001). Finding that Morton's claims were procedurally barred, amounted to harmless error, or were meritless, this Court affirmed the sentences of death. Id. at 329-35.
Morton then filed a motion for postconviction relief in June 2002. In the 3.851 motion, Morton alleged seven claims.[4] *237 Following a Huff[5] hearing, the trial court conducted evidentiary hearings on this initial motion between October 2003 and January 2004. Subsequently, in May 2005, Morton filed an amended motion for postconviction relief, incorporating the contents of the initial motion into his amended motion.[6] The trial court ultimately denied relief on all of Morton's claims. Morton raises three issues for this Court's review[7] and also petitions this Court for a writ of habeas corpus, raising three claims for relief.[8]

ANALYSIS

3.851 MOTION

I. Ineffective Assistance of Trial Counsel
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied. First, the defendant must establish that counsel's performance was deficient. Bell v. State, 965 So.2d 48, 56 (Fla.2007) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Second, the defendant must establish that counsel's deficient performance prejudiced the defendant. Id.
To establish the deficiency prong under Strickland, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." Morris v. State, 931 So.2d 821, 828 (Fla.2006) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). To establish the prejudice prong under Strickland, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *238 Id. (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).

A. Background Investigation
In his first issue on appeal, Morton alleges that the trial court erred in rejecting his claim that counsel rendered ineffective assistance in (1) failing to conduct a sufficient investigation into Morton's background; (2) failing to investigate and present evidence of neglect and abuse; (3) failing to investigate and present evidence of sexual abuse; and (4) failing to investigate and present evidence of poverty, neglect, and family dysfunction. Specifically, Morton alleges that reasonably competent counsel would have conducted further investigation after reviewing the sentencing order from the initial trial in order to counter the little weight given to the majority of Morton's mitigating factors and to improve the mitigation presentation upon resentencing. Morton contends that counsel could have discovered records that labeled Morton's father as "sexually deviant," information that Morton's family had been repeatedly evicted and had filed for bankruptcy, and information that Morton did not have a close relationship with his stepfather.
The trial court denied the claim, concluding that neither deficiency nor prejudice had been established. Specifically, the court stated that the jury had heard testimony about the physical abuse suffered by Morton and thus counsel's failure to present cumulative evidence regarding the abuse was not ineffective. Further, the court found that evidence of any sexual abuse was "limited and unclear" and therefore failure to present such an argument did not "fall below the level of reasonably competent representation." Moreover, the court noted that counsel did not err in failing to present evidence of the alleged alcoholism, posttraumatic stress disorder, deafness, or the criminal offense of Morton's stepfather, Lester Stacy, which occurred years before Morton's birth, because Morton did not demonstrate that these disorders or acts adversely affected or had any relevance to his childhood home environment. Finally, the court found that counsel's failure to introduce evidence of the family's bankruptcy and to dispute the portrayal that Morton had a loving home environment after Morton's mother divorced Morton's abusive father did not establish ineffective assistance. In comparing the testimony presented at the penalty phases and evidentiary hearing, we agree with the trial court's findings and conclude that the court did not err in rejecting Morton's background investigation and mitigation claim. Our review of the facts of this case reveal that Morton has failed to establish either prong of an ineffective assistance of counsel claim under Strickland and its progeny.
At the first penalty phase, counsel presented the testimony of eight witnesses, all of whom testified as to the abuse Morton suffered as a child and his family's poor background.[9] Based on this compelling *239 testimony, the trial court found as nonstatutory mitigation Morton's family background and physical and mental abuse. Upon resentencing, except for one witness, counsel chose to present essentially the same mitigation testimony.[10] The trial court again found Morton's family upbringing and abuse as nonstatutory mitigation.
At the evidentiary hearing, Gary Urso, Morton's counsel for both penalty phases, testified that he reviewed witness depositions and police reports in order to familiarize himself with the guilt phase. He also testified that the theory of the case was the "unattached, unbonded child" and that Morton's dysfunctional personality was a result of his family background and genetic traits. In support of this theory, Urso spoke with Morton's mother about his problems at birth and Morton's sister about their family life when they were growing up. He then retained Mimi Pisters, who also talked to Morton's mother and sister and had experience in working with unbonded, unattached children. In consideration of Morton's birth and family upbringing, Urso researched case law and read several books, specifically on the subject of the unattached, unbonded child. Further, Urso testified that he obtained Morton's school records for review and was aware of Morton's juvenile criminal record and his abusive activities with animals. In addition, Urso recalled reviewing the Department of Corrections' records on Morton's father. Finally, Urso hired a private investigator, Paul Krisanda, to investigate the allegations of sexual abuse.[11]
In our analysis of whether counsel conducted a reasonable investigation, we recognize that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). However, we conclude here that counsel's investigation into Morton's background was not deficient and accordingly deny relief as to this allegation in Morton's claim.
Regarding the failure to present evidence of physical abuse, neglect, and continued contact with a sadistic father, Morton presented testimony at the evidentiary hearing from Claudia Baker, who was hired to perform a social history investigation on Morton. Although Ms. Baker reviewed a vast amount of documents and performed an extensive investigation into Morton's background, her testimony did not largely differ from the evidence presented at the penalty phases. Ms. Baker testified that Morton suffered physical abuse and that his family had a history of mental illness, alcoholism, and abuse. She *240 further testified that Virgil Morton had a manslaughter conviction and that the Department of Corrections had labeled him "sexually deviant." She also testified that Morton's stepfather[12] did not take much interest in him and that his mother did not have much interaction with him. In essence, the sum of her testimony was that Morton was abused and neglected.
However, substantially similar evidence was presented at both penalty phases via the testimony of Morton's family members. Although Morton's contact with his father after the divorce was not disclosed at the trials, the evidentiary hearing testimony also did not indicate that any physical abuse occurred during these later meetings between Morton and his father. Because Baker's testimony mirrored what was presented at the penalty phase, it was merely cumulative to the evidence presented concerning the physical abuse and Morton has failed to demonstrate that counsel was deficient on this basis.[13]
Morton also asserts that counsel was ineffective for failing to investigate and present evidence of sexual abuse. When asked about his failure to present evidence of sexual abuse, Urso explained that he did not think he could advance a position that he did not believe to be true and the client denied being true. Thus, the decision made was not to ignore or fail to present sexual abuse, but rather not to present evidence that was questionable at best. In further testimony, Urso stated that neither Morton's mother nor his sister could confirm that Morton had been sexually abused by the father, Virgil.[14] Likewise, guilt-phase co-counsel John Swisher stated that, although Morton denied being physically and sexually abused, Angela confirmed that Morton suffered physical abuse but again was unsure of whether Morton was sexually abused. At the evidentiary hearing, counsel also presented the testimony of Morton's aunt, Robin Johnson, who said that she observed Virgil touching Morton in an inappropriate manner; however, this testimony contradicted statements in her deposition that she had never seen Morton being sexually abused by his father. Thus, we conclude that counsel in the instant case was not deficient in failing to present evidence of this abuse, particularly when the victim of the alleged abuse denied that he was ever assaulted.[15]
Additionally, Morton contends that counsel was ineffective in failing to present evidence of his poor upbringing and dysfunctional family life, even after his mother remarried. Morton emphasizes that Lester, his stepfather, did not get close to people, partly because of his record of aggravated assault with intent to kill while in the military. However, Morton does not demonstrate how this incident, which occurred years before Morton was born, affected his home life. There was no testimony presented at the evidentiary hearing *241 that his stepfather physically abused him and Morton makes no such allegation now. In fact, the State brought out during cross-examination at the penalty phase that both Kathy Dufoe and Paula Trepp, Morton's aunts, thought Lester was a "good" stepfather to Morton. The strongest evidence Morton presents is that his stepfather was "stand-offish" and had hardly any interaction with Morton. Failure to present such weak mitigation does not render counsel ineffective.
Likewise, the persuasiveness of Morton's assertion that he was raised in poverty and that the family suffered severe financial difficulties is severely weakened by testimony from his mother that he received a car, television, and video games from his mother and stepfather. Although the evidentiary hearing testimony indicates that much of what Morton received were second-hand items, it is difficult to determine that presenting evidence of the family's financial circumstances would have added to the mitigation considered by the court where evidence of these gifts was elicited on cross-examination. Although Morton's life after the age of eight was far from indulgent, it also does not qualify as the "dysfunctional" and poverty-stricken existence that counsel would have been deficient in failing to present in this case. Similarly, counsel's failure to present evidence that Morton's stepfather had filed for bankruptcy and that the family had moved several times would not be sufficient to establish ineffective assistance. Accordingly, we conclude that no deficiency has been established.
Yet, even if Morton demonstrates that counsel was deficient, he must still show that counsel's deficiency caused prejudice to his defense. See Jones v. State, 949 So.2d 1021, 1028 (Fla.2006) ("[F]or an ineffective assistance of counsel claim to be successful, the defendant must establish both deficient performance and prejudice...."). We find that he has failed to do so. Evidence of the abuse and neglect, though more detailed at the evidentiary hearing, was merely cumulative to the evidence presented at the penalty phases. Further, counsel's failure to offer evidence of Morton's poor upbringing and strained relationship with his stepfather does not undermine confidence in the outcome of the resentencing because it is not more compelling than the evidence of the physical abuse Morton suffered at the hands of his biological father, which was presented at the penalty phase. Accordingly, we conclude that Morton has failed to establish prejudice under Strickland. Because Morton has failed to demonstrate either deficiency or prejudice in counsel's investigation and presentation of mitigation evidence, we find this claim meritless.

B. Mental Health Mitigation
In his next ineffective assistance claim, Morton asserts that counsel failed to present sufficient mental mitigation and attacks the mental health evaluation done by his expert as inadequate. Specifically, Morton contends that the tests Dr. Del-Beato used to screen for brain damage were inadequate and that the total time he spent on the case was insufficient to perform an adequate evaluation. However, Morton's claim that he received an inadequate evaluation is procedurally barred as it could have been raised on direct appeal. See Cherry v. State, 781 So.2d 1040, 1047 (Fla.2000).
Even if Morton's claim were not procedurally barred, we would still conclude that the claim is without merit. This Court confronted a similar issue in Dufour v. State, 905 So.2d 42 (Fla.2005). In Dufour, the defendant alleged that his mental health examiner failed to perform an evaluation that would have revealed brain injury, mental illness, borderline to mentally *242 retarded IQ, and sexual abuse. Id. at 65-66. This Court rejected the claim, noting that the mental health expert from the trial and the expert from the evidentiary hearing arrived at more or less the same conclusion regarding the defendant's mental capabilities. Id. at 66.
Similarly, the diagnosis of Dr. DelBeato did not significantly differ from the diagnoses of the mental health professionals presented at the evidentiary hearing. At both penalty phases, Dr. DelBeato testified that Morton had mixed personality disorder with antisocial tendencies. Dr. Arturo Gonzalez, the State's expert witness at both penalty phases, agreed with Dr. Del-Beato's diagnosis that Morton suffered from antisocial personality disorder.[16] Even the two mental health professionals Morton presented at the evidentiary hearing, who arrived at different diagnoses,[17] conceded that Morton exhibited antisocial traits and behaviors. Specifically, Dr. Silva testified that "some of [Morton's] behavior loads into antisocial personality disorder and some of it is explained by the autism psychopathology." Moreover, when asked whether Morton met the constructs of antisocial personality disorder, he stated, "He comes close. It's one of those situations where it is close. It's one of those cases where it's very close." This Court has remanded for a new penalty phase "in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage." State v. Sireci, 502 So.2d 1221, 1224 (Fla. 1987). However, the record here indicates that this is not such a case.
Morton also alleges that counsel failed to provide pertinent background information to Dr. DelBeato or Mimi Pisters. Specifically, Morton states that the "most significant breakdown in Alvin's case was defense counsel's failure to obtain Alvin's birth records or tell the experts about Alvin's birth." However, Urso testified that he was "sure" that he discussed the birth records and potential for brain damage with Mimi Pisters. Moreover, although Urso did not recall what he told Dr. DelBeato about Morton's birth, Dr. DelBeato testified that Urso asked him if he thought oxygen deprivation at birth was a significant factor. Dr. DelBeato stated at the evidentiary hearing that based on Morton's early childhood medical records, which detailed a normal, cephalic child, the anoxia did not cause any considerable brain damage. Ultimately, he concluded, "There was nothing in the interview, in the testing or anything I've reviewed since that would suggest anything that would be significant as to organic brain damage." *243 Because the record indicates that both Dr. DelBeato and Mimi Pisters were aware of the circumstances of Alvin's birth, we reject this claim of deficient performance.
Further, Morton contends that counsel was ineffective by presenting damaging testimony from Dr. DelBeato that Morton suffered from antisocial personality disorder. Morton cites to several cases where this Court has held that counsel made a reasonable decision in not presenting mental mitigation where the defendant was diagnosed with antisocial personality disorder. See, e.g., Asay v. State, 769 So.2d 974, 986 (Fla.2000). However, as this Court has stated in the past, "[t]he issue is not what present counsel or this Court might now view as the best strategy, but rather whether the strategy was within the broad range of discretion afforded to counsel actually responsible for the defense." Occhicone v. State, 768 So.2d 1037, 1049 (Fla.2000).
As stated previously, Urso testified during the evidentiary hearing that the overriding theory of the case was that Morton "ended up with these personality problems as a result of his early environment." Co-counsel Swisher confirmed that the strategy for the penalty phase was to emphasize that the events leading up to the crime demonstrated that Morton should not be at fault for his actions. Swisher testified, "It appeared that what led to Alvin's condition is something that was a combination of his environment and genetic background...." Dr. DelBeato also testified that he "felt that the attachment and the dysfunctional family and things might be a consideration." Simply put, Dr. DelBeato agreed that his goal was to explain "how... Morton became the way he was ... [a]nd how he could commit that offense." Such a goal was consistent with Urso's "product of his environment" theory for the presentation of mitigation in Morton's case. Based on the record and the evidence from the evidentiary hearing, it is apparent that counsel made a tactical decision to present Dr. DelBeato's testimony. Because counsel's decision was based on reasonable strategy and did not result from a failure to investigate, we conclude that counsel's performance was not deficient.[18]
In addition, Morton has failed to demonstrate prejudice. The trial court found substantial aggravation in the instant case. As to the murder of Bowers and Weisser, the court found: (1) CCP; (2) the crime was committed during the commission of, or an attempt to commit, a robbery or burglary or both; and (3) the crime was committed for the dominant purpose of avoiding or preventing a lawful arrest. As to the murder of Weisser, the court found the additional aggravators of HAC and prior capital felony based on the murder of Bowers. Each factor in both murders was given great weight. This Court has previously stated that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme. Larkins v. State, 739 So.2d 90, 95 (Fla.1999). The trial court's sentencing order details the cold and cruel manner in which the murders were carried out. Several days before the murder, Morton discussed with various people his intention of killing someone. He proceeded to arm himself with a sawed-off shotgun and break into *244 Bowers and Weisser's home while being careful to conceal the gun in a towel, put the getaway bikes in a nearby bush, and wear gloves to avoid leaving fingerprints. Morton then shot Bowers after he pleaded for his life and attempted to shoot Weisser. However, when the gun jammed, he stabbed her in the neck with a Rambo-style knife; in total, Weisser was stabbed eight times. The stabbing was so brutal that it severed her spinal cord, which was deemed to be one of the causes of death.
Based on the substantial aggravation, the additional mental mitigation would not undermine confidence in the outcome of the resentencing. Therefore, we agree with the trial court's finding that Morton has failed to establish prejudice. As a result, we conclude that Morton's ineffective assistance claims are without merit.

II. Miscellaneous Evidentiary Rulings
Morton claims that the postconviction court abused its discretion in failing to take judicial notice of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which he sought to introduce in order to demonstrate counsel's deficient performance. Specifically, Morton alleges that trial counsel failed to meet the minimum ABA guidelines. The United States Supreme Court has referred to the ABA standards as "guides to determining what is reasonable." Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). However, Strickland explains:
In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.
Id. at 688-89, 104 S.Ct. 2052.
Even if we were to conclude that the trial court erred in its ruling, no reversible error occurred because Morton was still able to introduce expert testimony regarding trial counsel's alleged deficient performance based on prevailing standards for counsel in capital cases. Cf. Schwab v. State, 969 So.2d 318, 322-23 (Fla.2007) (stating that the trial court abused its discretion in failing to take judicial notice of certain evidence but concluding that such error was harmless). During the evidentiary hearing, counsel called attorney Robert Norgard to establish the prevailing standards for counsel in capital cases. Norgard was accepted as an expert in the area of capital criminal defense in Florida. In response to a series of hypothetical questions, Norgard testified that counsel's efforts in Morton's case constituted deficient performance.[19] Accordingly, any claim regarding the postconviction court's *245 ruling on judicial notice does not require reversal for a new evidentiary hearing.[20]

III. Weight Assigned to Age as a Mitigating Factor
In his final claim for postconviction relief, Morton contends that the trial court erred in summarily denying his claim that the United States Supreme Court's decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), this Court's decision in Urbin v. State, 714 So.2d 411 (Fla.1998), and newly discovered evidence call for the reweighing of his age as a mitigating factor.
At the time of the murders, Morton was nineteen and a half years old and, as the record shows, possessed at least average intelligence. The trial court found the age mitigator applicable, but assigned it little weight. We have already rejected this claim both as procedurally barred when brought in postconviction proceedings, see Farina v. State, 937 So.2d 612, 626 n. 7 (Fla.2006), and on the merits where a defendant was at or above the age of eighteen at the time of the murder. See Kearse v. State, 969 So.2d 976, 992 (Fla. 2007) (denying Roper claim where defendant was eighteen years and three months old at the time of the crime and had mental and emotional impairments); see also Stephens v. State, 975 So.2d 405, 427 (Fla.2007); Hill v. State, 921 So.2d 579, 584 (Fla.2006). Similarly, Roper has no application here where the facts are undisputed that Morton's chronological age was above nineteen at the time he committed the crimes. Because it is impossible for Morton to demonstrate that he falls within the ages of exemption, his claim is facially insufficient and it was proper for the court to deny Morton a hearing on this claim.
Morton also asserts that the trial court erred in denying his claim that newly discovered evidence from a 2004 brain mapping study, which establishes that sections of the human brain are not fully developed until age twenty-five, warrants a reweighing of his age as a mitigating factor. We have previously rejected recognizing "new research studies" as newly discovered evidence if based on previously available data. See Schwab, 969 So.2d at 325 (citing Diaz v. State, 945 So.2d 1136, 1144 (Fla.2006) (concluding doctor's letter addressing lethal injection research was not newly discovered evidence because conclusions in letter were based on old data)). Although this 2004 brain mapping study had not yet been published at the time of Morton's trials, Morton or his counsel could have discovered similar research at that time that stated that the human brain was not fully developed until early adulthood. See Jay D. Aronson, Brain Imaging, Culpability and the Juvenile Death Penalty, 13 Psychol. Pub. Pol'y & L. 115, 120 (2007) ("In the past few *246 decades ... neuroscientists have discovered that two key developmental processes, myelination ... and pruning of neural connections, continue to take place during adolescence and well into adulthood.... [B]rain regions responsible for basic life processes and sensory perception tend to mature fastest, whereas the regions responsible for behavioral inhibition and control, risk assessment, decision making, and emotion maturing take longer (Yakovlev & Lecours, 1967)."). Therefore, the 2004 study would not constitute newly discovered evidence and the trial court correctly denied this claim without an evidentiary hearing.

HABEAS PETITION
We now address Morton's habeas claims. First, Morton alleges several grounds to support his claim that appellate counsel provided ineffective assistance. Morton first alleges that counsel was ineffective by failing to challenge the sufficiency of the evidence establishing the ownership or possession element of the burglary charge underlying his felony murder charge from the initial trial. In response, the State points out that Morton failed to challenge the evidence relating to the ownership or possession element at his 1994 trial or 1999 resentencing. Accordingly, appellate counsel had no basis to raise this unpreserved issue on appeal.[21] Moreover, as in all death penalty cases, this Court is required to review sufficiency of the evidence. See F.B. v. State, 852 So.2d 226, 230 (Fla.2003); see also Fla. R.App. P. 9.140(i). This Court affirmed Morton's convictions on direct appeal, after concluding that there was sufficient evidence to support Morton's conviction of felony murder based on the burglary charge. Morton, 689 So.2d at 264. Accordingly, this subclaim is without merit. See Ponticelli v. State, 941 So.2d 1073, 1106-07 (Fla. 2006) (rejecting defendant's claim that counsel was ineffective for failing to challenge sufficiency of the evidence where Court's review on direct appeal found that the verdicts were supported by competent, substantial evidence).
Next, Morton contends that appellate counsel provided ineffective assistance by failing to appeal the trial court's finding of both the CCP and avoid arrest aggravators. However, because each aggravator was already reviewed and each aggravator is supported by independent facts, this claim must fail. As stated by this Court in Morton's initial direct appeal, "no improper doubling exists so long as independent facts support each aggravator." Morton, 689 So.2d at 265. In the instant case, the two aggravators focus on different facets of the crime. Although Morton killed Bowers and Weisser to avoid being identified as the perpetrator of the crime, the CCP aggravator focuses on the method of carrying out the crime, such as the selection of the victims' house and entering the home with a concealed firearm. Because each aggravator found by the trial court was supported by separate facts, improper doubling did not occur. As appellate counsel cannot be rendered ineffective for failing to raise a meritless argument, Morton's allegation fails. See Sliney v. State, 944 So.2d 270, 287 (Fla.2006).
Morton further asserts that counsel failed to raise the claim that his right to a public trial was violated at both his initial trial and resentencing. Our review *247 of the record does not indicate that Morton was deprived of a public trial, nor did trial counsel raise an objection regarding a public trial at either the initial or resentencing proceedings. Appellate counsel is not ineffective for failing to raise an issue that was not preserved at trial unless the claim rises to the level of fundamental error. See Rodriguez v. State, 919 So.2d 1252, 1281-82 (Fla.2005). Such error is not present in the instant case.
Finally, Morton alleges that appellate counsel was ineffective for failing to raise the claim that the trial court improperly denied Morton's motions to dismiss the indictment at the first trial. In total, Morton raised six separate motions, all of which were denied by the court. Morton concedes that this Court has held that these issues have no merit; however, he raises them to preserve the issues for federal review. We agree that we have rejected the claims Morton raises in his motions in similar cases and deny habeas relief as to this subclaim.[22]

CONCLUSION
Based on our analysis above, we affirm the trial court's denial of Morton's 3.851 motion for postconviction relief and deny his petition for writ of habeas corpus.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
NOTES
[1] Morton's motion also requested that the court vacate his convictions of first-degree murder but he has only appealed those issues relating to his sentencing.
[2] In sentencing Morton to death, the court found several aggravating factors for each murder. As to the murder of Bowers, the court found: (1) the crime was cold, calculated, and premeditated (CCP); (2) the crime was committed during the commission of, or an attempt to commit, a robbery or burglary or both; and (3) the crime was committed for the dominant purpose of avoiding or preventing a lawful arrest. As to the murder of Weisser, the court found: (1) the crime was heinous, atrocious, or cruel (HAC); (2) Morton had committed a prior capital felony, i.e., the murder of Bowers; (3) the crime was CCP; (4) the crime was committed during the commission of, or an attempt to commit, a robbery or burglary or both; and (5) the crime was committed for the dominant purpose of avoiding or preventing a lawful arrest. Each factor was given great weight for both murders. In mitigation, the court found the following statutory mitigators: (1) Morton's age (little weight); and (2) Morton's lack of significant history of prior criminal activity (some weight). In nonstatutory mitigation, the court found: (1) Morton was the product of a dysfunctional family (little weight); (2) Morton had little physical contact with his mother during the first four weeks of his life (little weight); (3) Morton's family moved frequently, disrupting any stable home and social life (little weight); (4) Morton was physically and mentally abused by his alcoholic father until he was eight years old (little weight); and (5) Morton voluntarily confessed and cooperated with law enforcement (little weight). Morton v. State, 789 So.2d 324, 328-29 (Fla.2001).
[3] Morton asserted that (1) the prosecutor made several improper comments during penalty-phase closing arguments that entitled Morton to a new penalty phase; (2) the trial court failed to find, consider, and weigh mitigating evidence that Morton suffered from antisocial personality disorder; (3) the trial court did not properly weigh the mitigating circumstances of Morton's age and history as an abused child; and (4) the resentencing judge erred by adopting the original sentencing judge's findings of fact regarding the aggravating and mitigating factors. Id. at 329.
[4] Morton alleged as follows: (1) he was deprived of a reliable adversarial testing due to ineffective assistance of counsel at the guilt and penalty phases; (2) he was deprived of his right to develop mitigating factors because the court-appointed psychiatrist failed to conduct appropriate tests for organic brain damage and mental illness; (3) the State violated the constitutional requirements under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and such actions and omissions by the State rendered defense counsel ineffective and prevented a full adversarial testing of the evidence; (4) the Florida death sentencing statute as applied is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; (5) section 921.141(5), Florida Statutes, is facially vague and overbroad and its unconstitutionality was not cured, his death sentence is premised on fundamental error, and trial counsel was ineffective for failing to litigate these issues; (6) the rules prohibiting Morton's counsel from interviewing jurors to determine if constitutional error was present violates the state and federal constitutions and denies Morton adequate assistance of counsel; and (7) cumulatively, the combination of errors deprived Morton of a fundamentally fair trial and appellate counsel failed to effectively litigate these claims on appeal.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] The amended motion raised two additional claims: (1) newly discovered mitigating evidence proves that Morton's brain was not fully developed, which would have resulted in a sentence less than death; and (2) the U.S. Supreme Court's decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), renders Morton's death sentence unconstitutional.
[7] These issues are (1) whether the trial court erred in rejecting Morton's claim that trial counsel rendered ineffective assistance during the penalty phase of his trial; (2) whether the trial court erred in declining to take judicial notice of the ABA guidelines regarding capital defense counsel and erred in its rulings on expert witness testimony; and (3) whether the trial court erred in summarily denying Morton's newly discovered evidence claim based upon Roper.
[8] Morton asserts that (1) appellate counsel failed to raise several meritorious claims which warrant reversal of his convictions and sentences; (2) his death sentence violates his federal constitutional rights because he did not have a constitutional jury verdict on each element of the capital offense; and (3) his Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of execution.
[9] Six of the witnesses were Morton's family members. Morton's aunts, Kathy Dufoe, Paula Trepp, Patricia Boutwell, and Jeannette Baker, testified that Morton's father, Virgil, was a cruel alcoholic who physically and emotionally abused him. Their testimony also indicated that Virgil had criminal convictions for manslaughter and arson. Barbara Stacy, Morton's mother, testified that Morton had poor health at birth and that Virgil was a heavy drinker who "abused everybody that was around him." He also bragged about how he had killed before and would kill anyone in the family if Barbara left him. Angela Morton, Morton's sister, testified that Virgil sexually molested her and physically abused her, Barbara, and Morton. Additionally, Wilhelmina (Mimi) Pisters, a social worker, testified that Morton's "personality makeup" was a direct result of the abusive environment in which he grew up, the lack of parenting skills from his mother, and the lack of stability as a child. Finally, Dr. Donald DelBeato, a clinical and forensic psychologist who evaluated Morton, testified that his family was dysfunctional and that his personality defects were derived from his background and genetic pool. Ultimately, Dr. DelBeato diagnosed Morton with mixed personality disorder with passive aggressive dependence and antisocial traits.
[10] Jeanette Baker, Morton's aunt, did not testify at the resentencing.
[11] Although Urso testified that he could not remember whether he hired Krisanda to investigate the allegations of sexual abuse, Urso testified without objection that Krisanda confirmed to him that he was hired for that very purpose, among other things.
[12] Morton's mother divorced Virgil when Morton was eight years old. She married Lester Stacy about five years later. Morton's contact with Virgil was minimal after the divorce.
[13] Jerry Baker, Morton's uncle, also testified at the hearing, stating that Virgil once threw Morton into a river before he was able to swim. This testimony is also cumulative as it merely relates to the extent of the abuse Morton suffered.
[14] On the other hand, both Angela Morton and Barbara Stacy were able to confirm that Virgil had sexually abused Angela. Evidence of Angela Morton's abuse was presented to the jury during Morton's second penalty phase.
[15] As we noted previously, Morton also denied being physically abused by his father, but counsel presented evidence of such abuse anyway because there was sufficient corroborating testimony from other witnesses.
[16] Dr. Gonzalez conducted a clinical interview of Morton after the initial trial but relied on the testing performed by Dr. Robert Berland, one of Morton's mental health evaluators for the evidentiary hearing, in his evidentiary hearing testimony that Morton did not suffer from brain damage.
[17] Dr. Berland testified that Morton had a chronic psychotic disturbance even though he did not exhibit any external signs of being psychotic. However, the reliability of this diagnosis is questionable as he stated, "While in some cases there may be some evidence of antisocial personality disorder, it's not something that I develop in detail, because that's not what I've been asked to do." He also agreed that he was unable to testify to a "reasonable medical degree of medical certainty that the statutory mitigators apply." He testified, "I'm not saying here and now that I can say or testify that [the statutory mitigators] exist. I'm saying that there is evidence that raises that possibility." However, Dr. Berland did not have access to data to corroborate whether the mitigators existed. Conversely, Dr. Jose Arturo Silva testified that Morton had Asperger's syndrome and was brain damaged. He concluded that there was evidence that Morton's ability to conform his conduct to the requirements of the law was substantially impaired.
[18] We likewise reject Morton's claim that his counsel was deficient in failing to present evidence that his codefendant, Robert Garner, received a life sentence. We agree that the trial court properly rejected this claim because the record failed to establish that either codefendant, Robert Garner or Timothy Kane, was equally culpable. Not only was Kane fourteen years old at the time of the crime, but it is clear from the record that Morton was the "ringleader" of the murders.
[19] For example, Norgard testified that it was standard practice among the Florida capital defense community to look into birth trauma, medical histories for purposes of genetic issues, school records, a family and social history, criminal records, and physical or sexual abuse as mitigation.
[20] We also reject Morton's claim that the court erred in excluding expert testimony from Claudia Baker regarding the prevailing standards in forensic social work. Any exclusion of that proffered testimony, if error, is harmless beyond a reasonable doubt because Baker was able to fully testify as to what actions she took in doing a reasonable background investigation, thus highlighting any alleged deficiency in the work of Morton's own social worker, Mimi Pisters. Moreover, as more fully explained above, Baker did not uncover any evidence that was substantially different from the mitigation presented at the resentencing. Finally, we reject Morton's claim of trial court error in allowing Dr. DelBeato to render an opinion as to whether Morton had Asperger's disorder. See Penalver v. State, 926 So.2d 1118, 1134 (Fla.2006) ("Once the witness has qualified as an expert, the trial judge also has broad discretion in determining the range of the subjects on which an expert can testify, and the trial judge's ruling will be upheld absent a clear error.") (citing Pagan v. State, 830 So.2d 792 (Fla.2002)).
[21] Counsel also conceded that the burglary aggravator was applicable in the instant case, stating to the jury at the resentencing, "It would be very difficult for me to come before you and argue that [Morton] wasn't engaged in the crime of burglary when these two murders occurred. He, in fact, was. That's what he was engaged in, the crime of burglary."
[22] We likewise reject Morton's remaining two habeas claims that his death sentence is unconstitutional pursuant to (1) Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because he did not have a constitutional jury verdict on each element of the capital offense; and (2) the Eighth Amendment prohibition on cruel and unusual punishment because he may be incompetent at the time of his execution. First, since our decisions in Johnson v. State, 904 So.2d 400 (Fla.2005), and Hughes v. State, 901 So.2d 837 (Fla.2005), this Court has consistently held that Ring and Apprendi do not have retroactive application in postconviction cases. See Connor v. State, 979 So.2d 852, 868 (Fla. 2007); Trotter v. State, 932 So.2d 1045, 1053 (Fla.2006). Because Ring and Apprendi were decided after Morton's conviction was affirmed by this Court on his first direct appeal in 1997, his Ring claim fails. Second, this Court has previously held that an incompetency at the time of execution claim is not ripe for review until a death warrant has been issued. See Jones v. State, 845 So.2d 55, 74 (Fla.2003) (rejecting claim that defendant may be incompetent at time of execution where a death warrant had not yet been signed, noting that the claim was raised to preserve the issue for federal review). Because a warrant has not been issued in this case, we reject this claim for lack of ripeness.