PER CURIAM.
Norman Blake McKenzie appeals his convictions for first-degree murder and his sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm McKenzie’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On October 17, 2006, a grand jury indicted the appellant, Norman Blake McKenzie, on two counts of first-degree murder for the homicides of Randy Wayne Peacock and Charles Frank Johnston. The charges against McKenzie resulted from the October 5, 2006, discovery of the bodies of Peacock and Johnston at a residence located in St. Johns County.
The evidence presented at trial established that on October 5, 2006, two Flagler Hospital employees became concerned when Randy Peacock, a respiratory therapist at the hospital, did not report to work. The two employees drove to the home that Peacock shared with Charles Johnston. Upon their arrival, they noticed that Peacock’s vehicle, a green convertible, was not there. When the employees entered the residence, they found Peacock lying face down on the kitchen floor in a pool of blood. When deputies from the St. Johns County Sheriffs Office (SJSO) arrived, they secured the scene and subsequently located the body of Charles Johnston in a shed that was also located on the property. While processing the crime scene, law enforcement officers located a hatchet inside the shed that appeared to have blood on its blade and handle. A butcher knife was found in the kitchen sink. Deputies observed a gold sport utility vehicle (SUV) in the driveway and determined that it was registered to Norman Blake McKenzie.
The deputies subsequently spoke with a neighbor of the victims. The neighbor stated that on October 4, 2006, he went to the victims’ home to assist Johnston with repairs on his vehicle. When the neighbor first arrived, Johnston was not there but Peacock was present and was speaking with a man whom the neighbor later identified in a photo lineup as McKenzie. The neighbor confirmed that he saw Peacock speaking with McKenzie between 4:30 and 7 p.m., and that he also observed a gold SUV in the driveway. The neighbor departed the victims’ residence before dark.
McKenzie subsequently had an encounter with a Citrus County sheriffs deputy during which Randy Peacock’s wallet was recovered from one of McKenzie’s pockets. Further, Charles Johnston’s wallet was located in a vehicle that McKenzie had recently operated. McKenzie agreed to speak with SJSO deputies on two separate occasions during which he confessed to the murders of Peacock and Johnston.
McKenzie explained that he went to the victims’ residence on October 4, 2006, to borrow money from Johnston because of his drug addiction. When he first arrived, only Peacock and the neighbor were present; however, Johnston returned home around dusk. The neighbor left after briefly speaking with Johnston, and at some point, Peacock went inside the residence. McKenzie then asked Johnston for a hammer and a piece of wood so that he could knock some “dings” out of the door of his SUV. Johnston could not locate a hammer and gave McKenzie a hatchet. While walking into the shed to locate a piece of wood, McKenzie struck Johnston in the head with the blade side of the hatchet. Johnston fell to the floor and McKenzie struck him again. McKenzie then entered the home, approached Pea *276 cock, who was cooking in the kitchen, and struck him with the hammer side of the hatchet approximately two times.
McKenzie returned to the shed, and when he observed that Johnston was still alive, he struck Johnston one or more times with the hatchet. McKenzie removed Johnston’s wallet from his pocket, placed the hatchet on top of a bucket inside the shed, and re-entered the residence. McKenzie observed that Peacock was struggling to stand up, so he grabbed a knife and stabbed Peacock multiple times. McKenzie then placed the knife in the sink, took Peacock’s wallet and car keys, and departed in Peacock’s vehicle.
An autopsy conducted on Randy Peacock revealed that the cause of his death was six stab wounds which caused extensive bleeding, with a contributory cause of blunt-force trauma to the head. The stab wounds suffered by Peacock were consistent with the knife found in the kitchen sink and the blunt-force trauma was consistent with the hammer side of the hatchet that was i-ecovered from the shed. An autopsy conducted on Charles Johnston revealed that the cause of his death was extensive head trauma due to the infliction of four “chop” wounds. The trauma to Johnston’s skull was consistent with the blade side of the hatchet that was recovered from the shed.
During a pretrial hearing, McKenzie expressed frustration with his court-appointed counsel because his right to a speedy trial had been waived without first consulting with him. When defense counsel sought a continuance on the basis that more time was needed to prepare for trial, McKenzie objected. McKenzie insisted that he was ready and wanted to proceed as expeditiously as possible. As a result, defense counsel moved to withdraw. The trial court, based upon McKenzie’s assertion that he was ready to proceed, denied the motion and scheduled a trial date.
During a second pretrial hearing, defense counsel again moved for a continuance, asserting that additional time was necessary to prepare for trial and to investigate mitigation. McKenzie again expressed frustration with his court-appointed counsel, stating that they had requested his medical records even though he had specifically advised them that he did not want this action taken. When the trial court recommended that McKenzie listen to his attorneys’ assertion that more time was required to properly prepare for trial, McKenzie responded that he did not need the assistance of counsel. Based upon this statement, the trial court scheduled a Far-etta [1] inquiry.
During the Faretta hearing, when asked by the trial court why he wanted to represent himself, McKenzie replied that he was ready for trial and did not need attorneys to prepare any sort of mitigation on his behalf. McKenzie also expressed the belief that he possessed sufficient intelligence to represent himself. With regard to his desire to proceed to trial as quickly as possible, McKenzie stated that he did not wish to subject his mother, his fiancée, or the victims’ families to an extended trial, and that he thought a protracted trial would be a waste of taxpayer funds.
When the trial court asked McKenzie why he wanted to discharge his court-appointed counsel, McKenzie replied that they insisted upon taking actions with which he disagreed. Defense counsel agreed that McKenzie’s displeasure with them arose from a difference of opinion with regard to trial strategy. After conducting a Faretta inquiry, the trial court concluded that McKenzie was competent *277 to waive counsel and that his waiver was knowing, intelligent, and voluntary. The trial court allowed McKenzie to represent himself but appointed standby counsel with McKenzie’s approval.
During the guilt phase of the trial, McKenzie admitted that he went to the victims’ home on October 4 with the intention of taking their money. McKenzie also admitted that he hit both Johnston and Peacock with the hatchet and stabbed Peacock with a knife. After the State rested its case, McKenzie stated that he would not offer any witness testimony and further declined to testify on his own behalf. On August 21, 2007, the jury found McKenzie guilty of two counts of first-degree murder.
After the verdict was announced, McKenzie advised that he would like to be represented during the penalty phase and the trial court appointed counsel. However, the next day McKenzie recanted his request and stated that the impact of the verdict caused him to be temporarily distracted from his intended course of action which was to expedite the trial proceedings. The trial court conducted a second Faretta inquiry and again concluded that McKenzie was competent to waive counsel. The trial court allowed McKenzie to represent himself but reappointed standby counsel.
During the penalty phase, an SJSO deputy testified that when McKenzie spoke to law enforcement he stated that he went to the victims’ residence with the intent to kill Peacock and Johnston for them money. The State introduced eight prior convictions for the following crimes: burglary while armed with a firearm and with an assault or battery; kidnapping with a firearm; strong-arm robbery; attempted robbery with a firearm; robbery with a firearm (three separate convictions); and carjacking. Finally, victim impact statements written by Charles Johnston’s daughter and Randy Peacock’s sister were read to the jury. After the State rested its case, McKenzie advised that he would not offer any mitigation evidence to the jury. However, following the prosecutor’s closing statement, McKenzie was allowed to place bank records into evidence for the purpose of demonstrating his financial behavior in the months before these crimes. By a vote of ten to two, the jury recommended that a sentence of death be imposed for each murder.
McKenzie advised the trial court that he wished to represent himself during the Spencer[2] hearing and that he did not intend to present any witnesses. In light of the minimal mitigation offered by McKenzie, the trial court ordered the Florida Department of Corrections (DOC) to prepare a presentence investigation report (PSI). During the Spencer hearing, the State did not present any additional evidence but discussed the aggravating circumstances that purportedly had been established and also reviewed potential mitigation factors, such as cooperation with law enforcement, cryptic references to child abuse,[3] and drug addiction. After stating that he would not expound upon any purported reference to child abuse, McKenzie read a statement that he prepared in which he expressed regret for the murders and apologized to the families of the victims.
The trial court subsequently sentenced McKenzie to death for the murders of *278 Randy Peacock and Charles Johnston. In pronouncing McKenzie’s sentences, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances: (1) McKenzie had previously been convicted of another capital felony or of a felony involving the use or threat of violence to the person, see § 921.141(5)(b), Fla. Stat. (2006) (eight prior convictions and the contemporaneous murder of the other victim) (great weight); (2) the murders were committed while McKenzie was engaged in the commission of a robbery, see § 921.141(5)(d) (significant weight); (3) the murders were committed for pecuniary gain, see § 921.141(5)(f) (merged with robbery aggravator — no additional weight given); and (4) the murders were cold, calculated, and premeditated (CCP), see § 921.141(5)(i) (great weight).
The trial court concluded that McKenzie had failed to prove the existence of the statutory mitigating circumstance that he was under the influence of an extreme emotional or mental disturbance at the time of the murders. Although McKenzie contended that he acted under the influence of cocaine, the trial court found that the admission of McKenzie’s bank statements alone was insufficient to establish this mitigating circumstance. Further, the trial court concluded that the evidence presented during trial overwhelmingly established that McKenzie was in complete control of his faculties at the time he committed the murders.
The trial court found a total of seven nonstatutory mitigating factors: (1) McKenzie suffered from a cocaine addiction (little weight); (2) McKenzie was the victim of child abuse (little weight); (3) McKenzie exhibited good behavior during court proceedings (some weight) (4) McKenzie expressed remorse (some weight); (5) McKenzie cooperated with police (some weight); (6) McKenzie possesses a GED and certificates in architectural design (very little weight); and (7) McKenzie is currently serving a life sentence for armed carjacking, and the minimum mandatory sentence for the murders is life without the possible of parole (little weight).
The trial court concluded pursuant to Muhammad v. State, 782 So.2d 343 (Fla.2001), that it could not afford the jury’s advisory recommendation great weight in light of McKenzie’s minimal presentation of mitigation during the penalty phase. Accordingly, the trial court conducted an independent evaluation and concluded that the aggravating circumstances established far outweighed the mitigating circumstances.[4] Based on this conclusion, the trial court imposed a sentence of death for each murder.
This direct appeal followed.
ANALYSIS
Sufficiency of the Evidence
As a preliminary matter, even if a defendant has not presented a sufficiency challenge, this Court has an independent obligation to review the record to determine whether sufficient evidence exists to support each conviction. See Overton v. State, 801 So.2d 877, 905 (Fla.2001); Fla. R.App. P. 9.142(a)(6). We conclude that abundant record evidence supports the convictions for the murders of Peacock and Johnston. In fact, McKenzie has consistently admitted that he murdered the victims.
*279 Judicial Neutrality
In his first challenge, McKenzie contends that the trial court sua sponte struck a juror for cause and, in doing so, imper-missibly departed from judicial neutrality. McKenzie asserts that the actions of the trial court constituted fundamental error and, further, that there was no basis upon which to strike this juror for cause. We disagree.
During voir dire, when the trial court asked jurors to provide details about themselves, juror Schultz stated that she previously had five children but one of her children was killed earlier that year under criminal circumstances. Juror Schultz also explained that she was married to a retired police officer and that her eldest daughter had previously served as a military police officer for five years. When asked to articulate her feelings with regard to the death penalty, juror Schultz stated that she could vote for either death or life and expressed a belief that she could be fair and impartial to McKenzie even though one of her children had been killed.
During jury selection, when asked if he wished to strike any jurors for cause, McKenzie moved to strike a juror other than juror Schultz and the State did not object. The following dialogue then occurred:
COURT: Okay. Mr. McKenzie, do you have any additional strikes through Mr. Neal?
MCKENZIE: No, ma’am, I don’t.
COURT: ... Does the State have any objection to ... Mr. King, Ms. Schultz, Ms. Lake, Mr. Barry, Ms. Davis, Ms. Green, Mr. Reames, Mr. Sweet, Ms. Brooks, Mr. Parsons, Mr. Neal, Mr. Rhodes?
STATE: Your Honor, we’re concerned about Ms. Schultz, based on her loss of her son as a murder victim, so—
COURT: That’s true.
STATE: — I think we’re going to go—
COURT: I’m going to strike her for cause. Although she indicated that she could be fair, she has a child that was recently murdered, and I’m going to strike her.
STATE: We’re fine then, Your Hon- or.
As noted by the State, McKenzie neither objected to the trial court’s striking of juror Schultz nor did he file a motion to disqualify the trial court based upon this allegedly improper conduct. Therefore, the instant challenge is unpreserved and procedurally barred for appellate consideration. See Perez v. State, 919 So.2d 347, 359 (Fla.2005) (holding that for an issue to be preserved for appeal, the specific legal argument or ground to be argued must have been presented to the lower court), cert. denied, 547 U.S. 1182, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006).
Moreover, even if this challenge had been preserved, it is without merit. A plain reading of the dialogue indicates that the trial court did not assume control of the jury selection process and did not strike juror Schultz sua sponte without any input from the parties. The State had affirmatively expressed concern with regard to the status of juror Schultz as the parent of a recently murdered child and the trial court merely interrupted and completed the State’s thought, rather than assuming the role of the prosecutor. Indeed, the State’s response, “We’re fine then,” after the trial court struck juror Schultz indicates that the trial court’s action was consistent with the concerns of the State.
The cases upon which McKenzie relies in support of this claim are materially *280 distinguishable in that they involved situations where the trial judge prompted the prosecution to either present certain evidence or take certain actions. See Evans v. State, 881 So.2d 808, 811 (Fla. 4th DCA 2002) (trial court suggested that the prosecution inquire into the immigration status of the defendant); Lee v. State, 789 So.2d 1105, 1106 (Fla. 4th DCA 2001) (trial court suggested a line of questioning to the prosecution with regard to identifying marks on the defendant’s body); Asbury v. State, 765 So.2d 965, 965 (Fla. 4th DCA 2000) (trial court prompted the prosecution to present certain evidence and sua sponte recalled witnesses to ask them questions); Lyles v. State, 742 So.2d 842, 843 (Fla. 2d DCA 1999) (trial court sua sponte ordered that the defendant be fingerprinted and bifurcated the hearing to permit additional testimony); Sparks v. State, 740 So.2d 33, 36 (Fla. 1st DCA 1999) (trial court suggested impeachment evidence to the prosecution). In the instant case, the trial court did not improperly inject itself into juror selection. It heard the concerns expressed by the State, understood this concern that the State wished to strike juror Schultz for cause, and merely proceeded to the proper ruling before the prosecutor had finished speaking. To the extent that the conduct of the trial court could be viewed as a departure from neutrality, this departure was actually in favor of McKenzie because it evidences an attempt to level the playing field for a pro se defendant in a capital case.
Further, to the extent that McKenzie contends that there was no reason to strike juror Schultz for cause, this assertion is conclusively rebutted by the record. Juror Schultz’s child was murdered during the same year in which McKenzie’s trial occurred. We conclude that a prospective juror whose child was murdered during the same year in which the relevant capital trial is proceeding should not be part of that jury. Moreover, even if the status of juror Schultz as the mother of a murdered child, standing alone, had not been adequate to disqualify her from service on this capital jury, that factor coupled with her additional status as the wife and mother of two former law enforcement officers would clearly “cross the line” and place her beyond service on this jury. Thus, contrary to McKenzie’s assertion, there was abundant cause for the State to move to strike juror Schultz and for the trial court to grant the request. Consequently, we deny this challenge.
Self-Representation
McKenzie next contends that the Faretta and Nelson[5] inquiries conducted by the trial court were defective and, for this reason, the trial court impermissibly permitted McKenzie to represent himself in violation of the Sixth Amendment. McKenzie only raises one specific challenge with regard to the Faretta inquiry— that the trial court did not specifically inquire with regard to McKenzie’s experience with the criminal justice system. According to McKenzie, this omission mandates that he receive a new trial. We disagree.
In Faretta, the United States Supreme Court held that a criminal defendant has a constitutional right to represent him- or herself, provided that the decision to do so is knowing, intelligent, and voluntary. See 422 U.S. at 835, 95 S.Ct. 2525. The Supreme Court did not provide a precise colloquy that a trial court must conduct for a Faretta inquiry to be adequate. However, the High Court did note that a defendant should be made aware of the hazards and disadvantages of self-representation to *281 the extent that the record would demonstrate that the defendant knew what he or she was doing and made the choice with “eyes open.” Id. Moreover, the Supreme Court indicated that neither legal knowledge nor legal skills are required as conditions precedent for a defendant to exercise the right to self-representation:
Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faret-ta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the “ground rules” of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself
Id. (emphasis supplied) (footnotes omitted).
In support of his assertion that the Far-etta inquiry was inadequate, McKenzie relies upon two cases from 1986 and 1988 in which we did indicate that to determine whether a waiver of counsel is knowing and intelligent the trial court should inquire into the defendant’s experience in criminal proceedings. See Hardwick v. State, 521 So.2d 1071, 1074 (Fla.1988); Johnston v. State, 497 So.2d 863, 868 (Fla.1986). However, in 1997 we clarified that whether a defendant can prepare an effective legal defense is not part of the Faretta inquiry:
[W]e hold that once a court determines that a competent defendant of his or her own free will has “knowingly and intelligently” waived the right to counsel, the dictates of Faretta are satisfied, the inquiry is over, and the defendant may proceed unrepresented. See Fla. R.Crim. P. 3.111. The court may not inquire further into whether the defendant “could provide himself with a substantively qualitative defense,” Bowen, 677 So.2d at 864, for it is within the defendant’s rights, if he or she so chooses, to sit mute and mount no defense at all.
State v. Bowen, 698 So.2d 248, 251 (Fla.1997) (footnote omitted); see also Hill v. State, 688 So.2d 901, 905 (Fla.1996) (“[A] defendant does not need to possess the technical legal knoidedge of an attorney before being permitted to proceed pro se.” (emphasis supplied)).
Subsequent to the decision in Bowen, this Court adopted current rule 3.111(d)(3), which provides: “Regardless of the defendant’s legal skills or the complexity of the case, the court shall not deny a defendant’s unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel.” Fla. R.Crim. P. 3.111(d)(3) (emphasis supplied); see also Amendment to Fla. R.Crim. P. 3.111(d)(S)-(3), 719 So.2d 873, 875 (Fla.1998). This subdivision replaced a provision that previously provided: “No waiver shall be accepted if it appears that the defendant is unable to make an intelligent and understanding choice because of a mental condition, age, education, experience, the nature or complexity of the case, or other factors.” Fla. R.Crim. P. 3.111(d)(3) (1992) (emphasis supplied). Thus, while our decisions in Hardwick and Johnston — and the pre-1998 version of rule 3.111 — may have implied that a trial *282 court should inquire into a defendant’s experience in criminal proceedings to determine whether a waiver of counsel is knowing and intelligent, since 1997, we have held that the ability to prepare a competent legal defense and technical legal knowledge (or lack thereof) are not relevant issues in a self-representation inquiry. Accordingly, we conclude that the Faretla inquiry conducted by the trial court here was sufficient.
The Nelson inquiry conducted by the trial court was also sufficient. In Nelson, the Fourth District articulated a procedure to be followed when a defendant contends that his or her court-appointed attorneys are incompetent:
If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether ... there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute.
Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973). This Court subsequently approved the procedure articulated in Nelson. See Hardwick, 521 So.2d at 1074.
McKenzie contends that the trial court never adequately addressed his main complaint concerning his counsel which was centered on the waiver of his right to a speedjr trial prematurely and without his consent. However, the trial court advised McKenzie that although the waiver without his consent may have angered him, the conduct, in itself, was not incompetent. McKenzie acknowledged to the trial court that he understood this legal principle. See generally State v. Kruger, 615 So.2d 757, 759 (Fla. 4th DCA) (“The principle is well established that the right to a speedy trial is waived when the defendant or his attorney request a continuance. The acts of an attorney on behalf of a client will be binding on the client even though done without consulting him and even against the client’s wishes.”), review denied, 624 So.2d 266 (Fla.1993).
Aside from this primary complaint, it does not appear that McKenzie believed that he was receiving incompetent representation from his court-appointed counsel. When asked about the competency of his counsel, McKenzie replied:
I don’t think they’re incompetent. I mean, they passed the Bar exam, okay? That in itself is an accomplishment. I don’t think I could pass the Bar exam.... Do I think they’re incompetent? No, I don’t. But do I think that they have my best interest ... at hand? No, I don’t. I think they have their own best interest at hand.
The trial court ultimately determined that a difference of trial strategy, not incompetence, was the reason discharge was sought. Accordingly, we conclude that any further Nelson inquiry, which is necessary only when the asserted reason for the discharge of appointed counsel is incompetence, was not required. See Nelson, 274 So.2d at 258-59. Moreover, McKenzie fails to clearly explain what the trial court should have done — but failed to do — to adequately explore and address bis complaints about his court-appointed counsel. *283 Accordingly, we conclude that this challenge is without merit.
Limitation of Standby Counsel
In his next claim, McKenzie contends that the trial court restricted his access to standby counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. McKenzie references only one portion of the entire trial during which the trial court purportedly limited standby counsel in an improper manner. The record reflects that the following dialogue occurred during a discussion of the penalty-phase jury instructions:
COURT: ... [T]he State’s indicated what they believe they’re going to prove up. You’ve told me what you think you’re going to prove up. And I will read to the jury what I believe has been proven at the close of evidence tomorrow. I’ll make my ultimate decision on what instruction — what mitigators and what aggravators are going to be given. Right now we’re going through them based on, you know, what the evidence is showing.
MCKENZIE: Okay. I just — I have no—
COURT (to standby counsel): He has to ask for your assistance. He’s not entitled to dual representation. He’s not entitled. He’s representing himself. He’s asked to represent himself. And if he has a question for standby counsel, he’ll ask you a question, but—
MCKENZIE: Well, I have this already written down, Your Honor, you know, and I had planned to say these words, and he’s—
COURT: I understand. If you have a question, you ask your standby counsel questions, but—
MCKENZIE: I really have nothing else to add to it.
McKenzie did not object on the basis that the trial court had improperly restricted his access to standby counsel. Therefore, this claim is not preserved for appellate review. See Perez, 919 So.2d at 359. Nonetheless, even if McKenzie had challenged the conduct of the trial court, he has not demonstrated entitlement to relief. In McKaskle v. Wiggins, 465 U.S. 168, 176, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the United States Supreme Court held that the Faretta decision established no “absolute bar” on unsolicited participation by standby counsel. However, the Court concluded that Faretta does not require a trial court to permit dual representation and further recognized that overly intrusive participation by standby counsel can defeat the right to self representation:
[T]he right to speak for oneself entails more than the opportunity to add one’s voice to a cacophony of others....
[T]he objectives underlying the right to proceed pro se may be undermined by unsolicited and excessively intrusive participation by standby counsel. In proceedings before a jury the defendant may legitimately be concerned that multiple voices “for the defense” will confuse the message the defendant wishes to convey, thus defeating Faretta’s objectives. Accordingly, the Faretta right must impose some limits on the extent of standby counsel’s unsolicited participation.
Id. at 177, 104 S.Ct. 944 (footnote omitted). In the context of proceedings held outside the presence of a jury, the Supreme Court held that “[i]f standby counsel’s participation over the defendant’s objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the Faretta right is eroded.” Id. at 178, 104 S.Ct. 944 (some emphasis sup *284 plied). The Supreme Court provided two specific instances in which the right to self-representation is not infringed upon even though standby counsel participates without solicitation by the defendant: (1) when standby counsel assists the defendant to overcome procedural or evidentia-ry obstacles toward the completion of a task that the defendant wishes to complete; and (2) when standby counsel assists the defendant to ensure compliance with basic rules of courtroom procedure and protocol. See id. at 183-84, 104 S.Ct. 944.
This Court has previously held that appellate counsel was not ineffective for the failure to challenge on direct appeal the alleged limitations that were placed on standby counsel in a capital case. See State v. Knight, 866 So.2d 1195, 1204 (Fla.2003), cert. denied, 541 U.S. 1066, 124 S.Ct. 2396, 158 L.Ed.2d 969 (2004). In Knight, the trial court advised the defendant that standby counsel was available to answer any questions that he had. See id. at 1204 n. 11. Standby counsel subsequently independently offered the defendant assistance with the jury instructions. See id. When the trial court inquired of the defendant with regard to standby counsel’s offer, the defendant advised that assistance was not necessary. See id. Based upon this assertion, the trial court informed the defendant:
[I]fyou request [standby counsel] assisting you in going over those jury instructions, he indicated to me that he is willing to do so, but without your request, I ask [standby counsel] to remain in his seat away from you so that it does not appear that you are represented by counsel or that he is participating in any way.
Id. at 1205 (emphasis supplied). We denied relief on his ineffectiveness claim there, concluding that the limitations placed on standby counsel by the trial court were based on the defendant’s stated desire that he be allowed to represent himself unimpeded. See id. at 1205-06.
In the instant case, standby counsel attempted to independently participate during a discussion of the penalty-phase jury instructions. This discussion occurred after the trial court completed the second full Faretta inquiry, which the trial court deemed necessary because McKenzie had initially requested the assistance of penalty-phase counsel even though he later withdrew this request. When the trial court asked McKenzie if he would like additional time to speak with his counsel, he replied that counsel had assisted him in every way that they possibly could. When the trial court granted McKenzie’s request to represent himself, the court expressly stated, “I will have your attorneys now act as standby counsel if you have any questions for them.” (Emphasis supplied.)
The record reflects that McKenzie was active and raised his own objections during the discussion of the penalty-phase jury instructions. For example, McKenzie requested that portions of his prior judgments be redacted. He also argued against the CCP aggravating circumstance. McKenzie engaged the trial court in an extensive dialogue with regard to whether a specific mitigating instruction should be read to the jury. When the trial court indicated that the instruction proposed by McKenzie would not be used, McKenzie objected to the ruling.
We conclude that the trial court did not improperly restrict the role of standby counsel here. McKenzie was abundantly clear when he expressed his request to represent himself during the penalty phase. Further, when the trial court granted McKenzie’s request to represent himself, he was advised that standby counsel would be available to him if he had any *285 questions. Therefore, it cannot be assumed that McKenzie expected or even desired standby counsel to independently participate in an unsolicited manner during any portion of the penalty phase. Finally, and perhaps most telling, when the trial court instructed that standby counsel not independently participate in an unsolicited manner, McKenzie was informed that he could ask his standby counsel any questions that he might have. McKenzie neither asked standby counsel any questions nor did he object to the trial court’s censure.
To hold that the trial court committed reversible error here would erode the Far-etta right to self-representation because it would allow standby counsel “to speak instead, of the defendant on ... matters of importance,” regardless of the wishes of a defendant. McKaskle, 465 U.S. at 178, 104 5.Ct. 944. Based upon McKenzie’s repeated desire to represent himself during his capital trial, we reject this claim and hold that the trial court did not improperly restrict the role of standby counsel.
Sentencing Order
McKenzie next asserts that the trial court erred when it drafted one sentencing order to address both murders. According to McKenzie, even though the trial court specifically discussed the individual facts of both murders, these facts were presented in one seamless order which produced a lack of individualized sentencing in the capital context in violation of the federal Eighth Amendment and article I, sections 9, 17, and 22 of the Florida Constitution. We disagree.
This Court has stated:
There is no prescribed form for the order containing the findings of mitigating and aggravating circumstances. The primary purpose of requiring these findings to be in writing is to provide an opportunity for meaningful review by this Court so that it may be determined that the trial judge viewed the issue of life or death within the framework of the rules provided by statute. It must appear that the sentence imposed was the result of reasoned judgment.
Holmes v. State, 374 So.2d 944, 950 (Fla.1979). The trial court specifically found that the State had established four statutory aggravating factors beyond a reasonable doubt and that there was evidence of seven nonstatutory mitigating circumstances. The trial court also found that the evidence presented did not establish the “extreme emotional disturbance” statutory mitigating factor. Due to the minimal mitigation offered by McKenzie, the trial court, in accordance with Muhammad, expressly declined to give the jury’s recommendations great weight and conducted an independent analysis of the aggravating and mitigating factors. The trial court ultimately concluded that the aggravating circumstances “far outweighed the mitigating circumstances.”
It is clear from the sentencing order that the trial court specifically and in detail found sufficient aggravating circumstances to justify the imposition of the death penalty for each murder even though a separate sentencing order for each crime was not prepared.[6] McKenzie has failed to provide decisional authority in which we vacated a death sentence based on the otherwise sound pronouncement of two death sentences in a single sentencing *286 order. The Pangburn and Snelgrove cases relied upon by McKenzie merely hold that a jury is required to make a sentencing recommendation for each count of first-degree murder that it considers, which undisputedly occurred in this case. See Snelgrove v. State, 921 So.2d 560, 570-71 (Fla.2005); Pangburn v. State, 661 So.2d 1182, 1188 (Fla.1995).
The sentencing order here is sufficient to evaluate whether the sentences imposed were the product of reasoned judgment. See Holmes, 374 So.2d at 950. Accordingly, we reject this claim and hold that the order is not defective or erroneous.
Proportionality
McKenzie next asserts that the death sentences imposed by the trial court are disproportionate. When this Court reviews proportionality, the totality of the circumstances should be considered and the matter should be compared with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This comparison, however, is not simply between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is reserved only for the most aggravated and least mitigated of first-degree murders. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
Here, the jury recommended the death penalty for each of the murders by a vote of ten to two. The trial court found these recommendations appropriate after independently weighing the statutory aggravating circumstances against the nonstatuto-ry mitigating circumstances pursuant to Muhammad. In imposing each death sentence, the trial court found four statutory aggravators: (1) prior violent felony (eight prior convictions and the contemporaneous murder of the other victim); (2) the murders were committed during the commission of a robbery; (3) pecuniary gain; and (4) CCP. See id. at 185-89, 104 S.Ct. 944. The trial court also found seven nonstatu-tory mitigating circumstances, only three of which were afforded “some” weight (as opposed to the other four, which received “little” or “very little” weight). None of the mitigating factors received “great,” or even “significant,” weight.
After reviewing the totality of the circumstances and decisional law, we conclude that the death sentences here are proportionate. This Court has upheld the death penalty as a proportionate sentence where the murder was committed for pecuniary gain, the defendant had been convicted of a prior violent felony, and little mitigation evidence was found. See, e.g., Lawrence v. State, 691 So.2d 1068, 1071 n. 3 (Fla.1997) (death penalty proportionate where defendant murdered the victim during a convenience store robbery; trial court found in aggravation prior violent felony, pecuniary gain, and that the defendant was under a prior sentence of imprisonment; and any existing mitigation was not entitled to substantial weight); Pope v. State, 679 So.2d 710, 712 n. 1 (Fla.1996) (death penalty proportionate where the defendant beat, stabbed, and kicked the victim; trial court found that prior-violent-felony and pecuniary-gain aggravators applied, and two statutory and three nonstat-utory mitigators applied); Heath v. State, 648 So.2d 660, 661, 663 (Fla.1994) (death penalty upheld where victim was shot and stabbed; trial court found in aggravation prior violent felony and that the murder occurred during commission of a robbery, and in mitigation extreme emotional disturbance, good character in prison, and that the codefendant received a life sentence); Melton v. State, 638 So.2d 927, 928-29 (Fla.1994) (death penalty proportionate where defendant murdered the victim during a pawn shop robbery; in aggravation, the trial court found that the *287 defendant had committed two prior violent felonies and that the murder was committed for pecuniary gain, and in mitigation that the defendant behaved well prior to trial and had a difficult family background).
Here, McKenzie not only satisfied the prior-violent-felony aggravating circumstance through the contemporaneous murder of the other victim, but he also had been convicted of eight prior felonies, each of which involved violence. Cf. Ocha v. State, 826 So.2d 956, 966 (Fla.2002) (prior-violent-felony aggravator was “[p]articularly weighty” where the defendant’s prior convictions included two counts of robbery and one count of attempted murder); La-Marca v. State, 785 So.2d 1209, 1216-17 (Fla.2001) (death penalty proportionate where the sole aggravating circumstance— two prior-violent-felony convictions—was significant, and the established mitigation was “insubstantial”).
Moreover, CCP is one of the weightiest aggravators in Florida’s statutory sentencing scheme, see Morton v. State, 995 So.2d 233, 243 (Fla.2008), and the trial court found that aggravating factor to apply here. Cf. Diaz v. State, 860 So.2d 960, 971 (Fla.2003) (death sentence proportionate where trial court found CCP and prior-violent-felony aggravating factors, and multiple statutory mitigating factors); Pagan v. State, 830 So.2d 792, 798, 802 (Fla.2002) (death penalty affirmed where trial court found CCP, prior violent felony, and pecuniary gain in aggravation, and several nonstatutory mitigating factors, including that the defendant suffered from a deprived childhood, a borderline personality disorder, and attention deficit disorder).
In the instant case, McKenzie, a defendant with an extensive violent criminal history, went to the victims’ home with the intent to rob and kill them. While there, he employed a ruse to convince one of the victims to provide him with what was ultimately one of the murder weapons (i.e., a hatchet). While the victims were separated, McKenzie struck each of them with the hatchet multiple times. When McKenzie realized that neither of the victims had died as a result of the blows, instead of taking their wallets and leaving them alive but incapacitated, he chose to continue his attack, first with the hatchet and then with a butcher knife. Our prior precedent, the sheer brutality of these murders, the persistence with which McKenzie sought to complete them, and our full proportionality analysis leads us to conclude that both death sentences are supportable.
Constitutionality
Under his final claim, McKenzie contends that Florida’s capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and asks this Court to reconsider its contrary holdings in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002). McKenzie also asserts that because both the State and the trial court repeatedly emphasized to the jury during trial that the ultimate sentencing decision rested with the court, the role of the jury in the sentencing process was diminished in contravention of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Lastly, McKenzie challenges the constitutionality of his sentences on the basis that the jury did not make specific findings with regard to aggravating and mitigating circumstances and, therefore, it is impossible to determine whether the jux*y was unanimous in its decision as to which aggravating circumstances applied.
As noted by the State, the constitutional challenges raised by McKenzie are unpreserved because they were not pre *288 sented by McKenzie below. See Perez, 919 So.2d at 359. Further, even if they had been raised, they lack merit. One of the aggravating factors found by the trial court was McKenzie’s prior convictions for eight violent felonies (plus the conviction for the murder of the other victim here), and this is a factor which, pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring, does not need to be found by a jury. See Jones v. State, 855 So.2d 611, 619 (Fla.2003). Moreover, this Court has consistently rejected Caldwell challenges to the standard penalty-phase jury instructions. See, e.g., Evans v. State, 975 So.2d 1035, 1053 (Fla.2007); Mansfield v. State, 911 So.2d 1160, 1180 (Fla.2005); Card v. State, 803 So.2d 613, 628 (Fla.2001). Accordingly, we again reject these claims.
CONCLUSION
Based upon the foregoing analysis, we affirm McKenzie’s convictions and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result only with an opinion, in which POLSTON, J., concurs.

. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The PSI report prepared by the DOC noted that McKenzie's fiancée “would not discuss [McKenzie's] family.... She did state that his parents should be the ones incarcerated and not him. She would not go into any detail.”

. The trial court further concluded that "[e]ven in the absence of [CCP] ... the remaining aggravating circumstances would far outweigh the mitigating circumstances.”

. Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).

. Indeed, since the murders occurred within minutes of each other at the same address and were committed for the same purpose (i.e., to rob the victims), it is logical that the aggravating and mitigating factors for each murder — and the facts that support those factors — would be the same.